PAN AMERICAN LIFE INSURANCE COMPANY, Appellant,

v.

Inocencio BLANCO, Appellee.

No. 19569.

United States Court of Appeals
Fifth Circuit.

Nov. 7, 1962.

James A. Dixon, David S. Stern, Miami, Fla., H. C. Kilpatrick, Washington, D. C., Dixon, DeJarnette, Bradford, Williams, McKay & Kimbrell, Miami, Fla., for appellant.

Joseph A. McGowan, Miami, Fla., Carey, Goodman, Terry, Dwyer & Austin, Miami, Fla., for appellees.

Before JONES and BELL, Circuit Judges, and ESTES, District Judge

ESTES, District Judge.

This is an interlocutory appeal with leave of this court from an order of the United States District Court for the Southern District of Florida, striking three paragraphs of defendant Pan American Life Insurance Company's answer and dismissing its counterclaim for declaratory judgment of non-liability on three lifetime annuity policy contracts purchased from Pan American by plaintiff Inocencio Blanco, in which his three minor daughters were annuitants.

Sr. Blanco and his daughters are Cuban nationals, now residing in the United States.

■ Pan American, a New Orleans, Louisiana corporation, issued and delivered to Sr. Blanco the three separate single premium annuity contracts in controversy.[1] The contracts provide for the payment of $100 per month to begin as each daughter attained the age of 21 years. Each of the contracts provides that it "is signed on the 18th day of May 1945, this being the date of issuance". The signatures of Pan American officials executing the policies were authenticated before a notary in Havana, Cuba on May 30, 1945. Sr. Blanco then and there paid the single premium in cash in United States dollars and received the policies.

Each contract provides that "this contract and its respective application, copy of which is added to and forms part of same, constitute the whole contract", and that "a copy of same shall be endorsed in this contract or annexed to it at issuance". None of the policies in the record contains a copy of the application required to be endorsed in or annexed to the policy "at issuance".

A dispute exists between the parties as to whether the contracts "were applied for"[2] and "made"[3] and governed by the laws of the State of Louisiana or Cuba.

Each of the contracts provides that:

"Pan-American Life Insurance Company New Orleans, U.S.A.

\* \* \* \* \* \*

"Agrees to Pay a Lifetime Annuity in the amount of One Hundred 00/100 Dollars a month, with guaranteed payments \* \* \*"

and that:

"All liquidations under this contract are payable in the Head Office of the Company in New Orleans, by means of delivery of this contract to the Company."

and further that:

"This contract is exempt of restrictions with respect to residence, travels and occupation."

Plaintiff Blanco filed suit on the policies in the Circuit Court of Dade County, Florida. The case was removed to the

---

1. Policy No. 400–266, Premium $18,084, on Gloria Maria de la Milagrosa Blanco y Diez, age 1, payments to begin May 18, 1965
   Policy No. 400–267, Premium $20,232, on Ana Maria Blanco y Diez, age 5, payments to begin May 18, 1961
   Policy No. 400–268, Premium $22,888, on Maria de Lourdes Blanco y Diez, age 9, payments to begin May 18, 1957

2. "8. The affiant is informed and believes that the annuity contracts here involved were applied for in Cuba, the premiums therefor were paid in Cuba, and the con-

tracts were delivered in Cuba, after first being notarized in Cuba before a Cuban Notary, and if this be so, were, under Cuban law, governed in all things and matters whatsoever by the law of Cuba." Affidavit in Opposition to Motion for Summary Judgment by Dr. Francisco Figueroa, p. 65 of Transcript.

3. The Court's Order and Certificate for Interlocutory Appeal under 28 U.S.C. § 1292(b), recites that in its opinion the contracts were "made in New Orleans, Louisiana."

United States District Court for the Southern District of Florida. Pan American then filed its counterclaim in the United States District Court against plaintiff Blanco and his daughters for a declaratory judgment of non-liability. The United States District Court granted the motion of plaintiff Blanco to strike paragraphs 4, 5 and 6 of Pan American's answer and dismissed Pan American's counterclaim against Blanco and his three daughters seeking a declaration of non-liability based upon the same grounds set forth in paragraphs 4, 5 and 6 of the Pan American answer.

The stricken paragraphs of Pan American's answer and counterclaim allege that Pan American is relieved of liability and performance of its obligations under the contracts by reason of certain Cuban laws and decrees, referring to: (1) Cuban Law No. 13 of 1948 and Cuban Monetary Decree of 1951 under Law No. 13, which Pan American alleged "required all contracts theretofore payable in dollars to or by Cuban nationals in Cuba to be payable in Cuban pesos", (2) Cuban Law No. 568 of September 29, 1959, which Pan American alleges prohibited the defendant from paying any monies to Cuban nationals anywhere except in Cuba, (3) Cuban Law No. 851 of July 6, 1960 and Cuban Resolution No. 3 of October 24, 1960 under Law No. 851 "which in substance and effect" expropriated the Cuban assets of Pan American "and substituted the Cuban government as the obligor" in "the annuity contracts herein sued on".

None of the laws or resolutions referred to are contained in the record except Resolution No. 3. Attorney Figueroa's affidavit recites that "such laws and regulations *exist in fact and have,* under Cuban law, the *legal effect* attributed to them in the said answer and counterclaim", that "Pan American Life Insurance Company has been relieved of liability" on the policies, and that "it is impossible at the present time for Pan American Life Insurance Company to perform the said annuity contracts."

The record does not show whether there has been discrimination against nationals of the United States as it does not disclose whether the Cuban business and assets of nationals of Cuba or of other countries engaged in the insurance business in Cuba were likewise expropriated.

In this state of the record the United States District Court certified to this court the following question:

"Does such seizure by the Cuban Government under the said resolution excuse Pan American Life Insurance Company from any obligation under a policy paid for in a lump sum premium in United States currency in 1945 in Cuba, notwithstanding that the policies were executed by Pan American Life Insurance Company, which is a corporation organized under the laws of one of the United States and which provides for payment in the United States dollars in the City of New Orleans, Louisiana, and has the further proviso that the policy is exempt of any restrictions with respect to the residence, travels and occupations of the owner or beneficiary of said policy, and notwithstanding, that the owners and beneficiaries who are Cuban Nationals, all now reside in the United States of America?"

In their briefs in this court the parties differ as to whether the question certified properly states a "controlling question of law" under 28 U.S.C. § 1292 (b).

Pan American's brief [4] urges that there are two controlling questions, *first,* in effect, whether Cuban Law No. 568 of September 29, 1959 terminated the right of the Blancos, Cuban nationals, to enforce Pan American's policy obligations to pay in dollars in New Orleans, Louisiana, and, *second,* in effect, whether the expropriation Resolution No. 3 of October

---

4. Brief of Appellant, pp. 5, 6 and 7.

24, 1960 "substituting the Cuban government as the obligor upon the insurance company's policies outstanding in Cuba" makes Pan American's policy obligations unenforceable against it.

The Brief of Appellee [5] counters that "the sole question involved is that certified by the District Court" and that "the laws referred to by Pan American may not be considered by this court" by reason of "the absence from the record of both pleading and proof of foreign law", citing Miller v. Shulman, Fla.App., 122 So.2d 589.

In support of its argument on the first of the asserted questions, that the Blancos' rights to enforce payment in dollars in the United States were made unenforceable by Cuban Law No. 568 of September 29, 1959 requiring payments to Cuban nationals to be made in Cuba in pesos, Pan American argues that Cuban Law No. 568 is valid and binding under The Bretton Woods Monetary Agreement of 1945 to which Cuba and the United States are signatories, which was incorporated into the laws of the United States in 22 U.S.C. § 286; that the annuity policies in controversy are "exchange contracts" [6] within the meaning of such Agreement and subject to the exchange control regulations of Cuba. In this connection Pan American's Reply Brief states that "only one other question remains: Is Cuban Law 568 'maintained or imposed consistently with' The Bretton Woods Agreement?" [7] It then quotes portions of a letter from the General Counsel of the Monetary Fund which Pan American contends establishes the fact "that Law No. 568 is a currency control regulation which is 'maintained or imposed consistently with' The Bretton Woods Agreement." No such letter appears in the record. Application of The Bretton Woods Agreement involves other questions of fact and law as to which there is no proof in the record.[8]

Finally, Pan American argues that "Law No. 568 has expropriated the Blancos' right to receive payment elsewhere than in Cuba and in Cuban currency, and Resolution No. 3 has expropriated their right to seek payment from Pan American rather than from the Cuban state," and that under the Act of State Doctrine the Courts of the United States may not inquire into the validity of the Cuban laws and decrees referred to in Pan American's pleadings.

Plaintiff Blanco and his daughters contend that "the laws of Cuba are inapplicable and could not and did not affect the duty owed by Pan-American to pay Blanco the sums due under the policies under consideration," and that the expropriation Laws and Resolutions referred to did not seize or expropriate the Blancos' rights to enforce Pan American's obligation under these policies.[9]

---

5. Brief of Appellee, pp. 5 and 6.

6. "Exchange contracts which involve the currency of any member and which are contrary to the exchange control regulations of that member maintained and imposed consistently with this Agreement shall be unenforceable in the territories of any member." Art. 8 Sec. 2(b) of the Bretton Woods Agreement, incorporated into United States law as 22 U.S.C. § 286. (Brief of Appellant, p. 9)

7. Reply Brief of Appellants, p. 15.

8. Has Cuba incorporated the Bretton Woods Agreement into its law as did the United States, in Title 22 U.S.C. § 286? Has Cuba complied with its obligations under such agreement? Did Cuba's withdrawal from the International Bank for Reconstruction and Development, on November 14, 1960 (see Dept. of State Bulletin XLIII, No. 1121, December 19, 1960, p. 945; Encyclopedia Brittanica Book of the Year, 1962 Edition, p. 342 and p. 347) constitute such a breach of the purposes of the fund as set forth in Art. I as to render such Agreement ineffective as to Cuba"? Are the annuity policies in question "exchange contracts" within the meaning of Art. VIII, Sec. 2 (b) of the Bretton Woods Agreement?

9. "The 1948 law, for example, does not require that payment of obligations due Cuban nationals be made only in pesos. The law does require that, if an obligation is paid within the Republic of Cuba, then, and in that event only, the national currency of Cuba, pesos, must be accepted in payment of obligations.

"Law No. 568," of September 29, 1959,

■ This Court will not take judicial notice of the Cuban laws and resolution referred to.[10]

In Banco Nacional de Cuba v. Sabbatino et al.[11] the Court of Appeals for the Second Circuit held that Executive Power Resolution No. 1 of August 6, 1960, under Cuban Law 851 of the same date, expropriating the Cuban assets of C. A. V., a Cuban corporation "over 90%" of whose shareholders are residents of the United States, violated international law because assets of United States nationals were confiscated without adequate compensation as "part of a scheme of reprisal" against the United States which discriminated against United States nationals since there was no similar seizure of the assets of the nationals of Cuba or of other countries; and that the Act of State Doctrine did not prevent the courts of the United States from determining that such resolution was invalid and without force and effect.

This Court, in Menendez Rodriguez v. Pan American Life Insurance Company and Vento Jaime v. Pan American Life Insurance Company[12] applied the legal principles enunciated in Judge Waterman's opinion in Sabbatino to actions by Cuban nationals now residing in the United States for the cash surrender value of policies issued by Pan American; held that "Our courts are not compelled by the Act of State Doctrine to give force and effect to the decrees of the Castro government in Cuba"; and reversed orders dismissing the complaints and remanded the cases to the District Court for determining, upon development of all the facts, whether the Cuban decrees involved were confiscatory and violative of the principles of international law "and therefore without status in these particular cases."

From the foregoing it is apparent that the action of the trial court in sustaining plaintiff Blanco's motions to strike and to dismiss the counterclaim of Pan American was error[13] and that this case should be determined by the District Court upon full hearing on the merits.

This cause is reversed and remanded with directions for further proceedings not inconsistent with this opinion.

Reversed and remanded for further proceedings.

"is directed not to the party making the payment but to the resident of Cuba. * * *" (Brief of Appellee, pp. 5–6, 14).

10. Liechti v. Roche (5 Cir. 1952), 198 F. 2d 174; McCormick, Evidence, pp. 698–700; 2B Barron & Holtzoff, Fed.Prac. & Proc. Sec. 963, n. 35.

11. 307 F.2d 845 (2 Cir., 1962): "The Act of State Doctrine, briefly stated, holds that American courts will not pass on the validity of the acts of foreign governments performed in their capacities as sovereigns within their own territories. * * * this doctrine is one of the conflict of laws rules applied by American courts; it is not itself a rule of international law."

"However, when the executive branch of our Government announces that it does not oppose inquiry by American courts into the legality of foreign acts" (as it did here) "an exception to the judicial abnegation required by the act of state doctrine has arisen."

"International law is derived indeed from the customs and usages of civilized nations, but its concepts are subject to generally accepted principles of morality whether most men live by these principles or not."

12. 311 F.2d 429 (5 Cir., 1962).

13. "Motions to strike * * * are not favored. Matter will not be stricken from a pleading unless it is clear that it can have no possible bearing upon the subject matter of the litigation. If there is any doubt as to whether under any contingency the matter may raise an issue, the motion should be denied." 2 Moore's Fed.Prac., 2d ed., ¶ 12.21 [2], pp. 2317–2318.