362 F.2d 167
 PAN-AMERICAN LIFE INSURANCE COMPANY, Appellant,
v.
Inocencio BLANCO et al., Appellees.
PAN-AMERICAN LIFE INSURANCE COMPANY, Appellant,
v.
Guido CONILL, Appellee.
AMERICAN NATIONAL INSURANCE COMPANY, Appellant,
v.
Jose Antonio LORIDO y DIEGO, Appellee.
PAN-AMERICAN LIFE INSURANCE COMPANY, Appellant,
v.
Maria Teresa Paula Aguirregaviria ZABALETA, Appellee.
 No. 20942.
 No. 20944.
 No. 20955.
 No. 20943.
 United States Court of Appeals Fifth Circuit.
 June 13, 1966.
 Rehearing Denied in No. 20943, August 3, 1966.
 
 James A. Dixon, Sam Daniels, Miami, Fla., for Pan-American Life Ins. Co.
 Stanley Arthur Beiley, Joseph A. McGowan, Wesley Carey, John Robert Terry, George H. Salley, Miami, Fla., for appellee Zabaleta.
 Herbert A. Kuvin, Joseph A. McGowan, Wesley Carey, John Robert Terry, Miami, Fla., Carey, Terry, Dwyer, Austin, Cole & Stephens, Miami, Fla., for appellees Blanco, Conill, and Lorido y Diego.
 Before TUTTLE, Chief Judge, JONES, Circuit Judge, and GROOMS, District Judge.
 JONES, Circuit Judge:
 
 
 1
 These four appeals, each somewhat different from the others, involve the effect of expropriation laws and resolutions of the Castro government of Cuba. Consideration is required of the Sabbatino case[1] and of the so called Sabbatino Amendment.[2] Pan-American Life Insurance Company is a Louisiana corporation with its principal place of business at New Orleans in that State. American National Insurance Company is a Texas corporation with its principal place of business in Galveston, Texas. Pan-American conducted a life insurance business in Cuba from 1913 until October 26, 1960, maintaining a branch office in Havana. American National was in the insurance business in Cuba from 1949 to October 24, 1960, with a general agent in Havana.
 
 
 2
 On May 18, 1945, Inocencio Blanco, who was then both a citizen and resident of Cuba, purchased from Pan-American three single premium annuity contracts, for the benefit of his three daughters, Gloria, Ana and Maria. Each contract provided for the payment by Pan-American to the designated daughter of Blanco the sum of $100 per month commencing on a specified date in the future. Blanco, the father, retained control of the contracts and the right of exercising the privileges and benefits.
 
 
 3
 In 1941, Pan-American issued to Guido Conill, who was then a citizen and resident of Cuba, a policy of insurance on his life payable to a named beneficiary and requiring the payment of annual premiums.
 
 
 4
 The appellee, Maria Teresa Paula Aguirregaviria Zabaleta, in 1938, while a Cuban citizen and resident, procured a thirty-five year endowment policy on her life. Originally the Zabaleta policy, like the Blanco contracts, called for payment by Pan-American in New Orleans in dollars. By an amendment made in 1952 it was provided that "all premiums, all benefits and all claims payable under its terms be demanded and payable in the national currency of Cuba, in Havana, Cuba, on the basis of one peso for each dollar, required by the contract."
 
 
 5
 Applications for all of the Pan-American policies[3] were made in Cuba in the Spanish language. The policies were prepared in New Orleans where they were signed and then sent to Cuba, and there they were authenticated and delivered. All of these policies were, at the outset, payable in New Orleans in dollars and all of them remained so payable except the Zabaleta policy which, as has been noted, was amended by endorsement.
 
 
 6
 American National issued a twenty-year endowment policy to the appellee, Jose Antonio Lorido y Diego, in 1950 and another in 1951. The applications for these policies, as in the case of the Pan-American policies, were made in the Spanish language in Cuba, and the policies were written up in the United States and sent to Cuba for delivery. Unlike the Pan-American policies which were in Spanish, the American National policies were in English.
 
 
 7
 Prior to June 30, 1951, the United States dollar was legal tender in Cuba. On that day, pursuant to legislation and a Presidential decree, the dollar ceased to be legal tender. After the Castro regime took over Cuba in 1959, a currency control law was enacted making it illegal to transfer currency or other funds to points outside of Cuba except when authorized by a permit. In retaliation against the United States for its action in reducing the Cuban sugar quota, the Cuban government enacted Law 851 of July 6, 1960, which authorized the nationalization through expropriation of properties or concerns belonging to natural or juridical persons, nationals of the United States. Under Law 851, Resolutions were adopted nationalizing and expropriating the Cuban properties and assets of many business entities of the United States. Resolution No. 3, dated October 24, 1960, declared the expropriation and nationalization of specified properties and concerns, including Pan-American Insurance Company and American National Insurance Company. The Resolution incorporates the following:
 
 
 8
 "Therefore, the Cuban state is declared subrogated in place and grade of the natural and juridical persons referred to in the preceding section with respect to the properties, rights and rights of action mentioned, as well as the assets and liabilities constituting the capital of the concerns referred to."
 
 
 9
 Blanco, his daughter, Conill, Zabaleta and Diego became exiled residents of Florida. Pan-American advised Blanco that it would make no payments under the annuity contracts purchased by him. Conill and Zabaleta made demand upon Pan-American, and Diego made demand upon American National, for the cash surrender values of their respective policies. Payment was refused. Actions were brought against the insurance companies for declaratory judgments to determine that the annuity contracts of the Blancos and the insurance policies of the others are valid and binding upon the insurers and are payable in the United States and in United States dollars. Pan-American, in the actions brought against it by Blanco, counterclaimed for a declaratory judgment that it was not liable on the annuity contracts.
 
 
 10
 The Blanco case was before this Court on an interlocutory appeal and the cause was remanded for a determination by the district court of substantially the same questions as are presented by the present appeal of that case. Pan-American Life Insurance Co. v. Blanco, 5th Cir. 1962, 311 F.2d 424. The factual situations, stated in some more detail than here, and the principles which the district court regarded as controlling are set forth in its opinion. Blanco v. Pan-American Life Insurance Co., 221 F.Supp. 219. Subsequent to the decision of the district court, the Supreme Court handed down its opinion in the Sabbatino case, note 1 supra, holding that the courts will not examine the validity of a taking of property by a foreign government within its own territory, where such government is recognized by the United States, in the absence of a treaty or other agreement, even if it is asserted that the taking was in violation of international law. The dissatisfaction of the Congress with the effect of the decision led to the enactment of the so-called Sabbatino Amendment[4] to the 1964 Foreign Assistance Act. There may be a question as to the validity of the Sabbatino Amendment in view of some of the comments in the Sabbatino opinion. Cf. Banco Nacional de Cuba v. Farr, D.C.S.D.N.Y.1965, 243 F.Supp. 957. However, we think it is unnecessary, in disposing of these appeals, to consider whether the Sabbatino Amendment is valid.
 
 
 11
 In each of these cases there was a pretrial stipulation that Federal jurisdiction was invoked on the ground of diversity of citizenship and amount in controversy. In diversity cases, a Federal court must follow and apply the conflict of laws rules of the state in which it sits. Klaxon Company v. Stentor Electric Manufacturing Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; Griffin v. McCoach, 313 U.S. 498, 61 S.Ct. 1023, 85 L.Ed. 1481, 134 A.L.R. 1462; Sperry Rand Corporation v. Industrial Supply Co., 5th Cir. 1964, 337 F.2d 363. Although the determination of these cases may require consideration of the act of state doctrine and the Bretton Woods International Monetary Fund Agreement, it is our view that the conflicts of laws rules are to be those of the forum. In cases scarcely distinguishable on their facts from the Blanco and Conill situations, a District Court of Appeal of Florida held that matters connected with the performance of a contract are regulated by the law prevailing at the place of performance, and decided that policies of insurance of Pan-American payable in the United States in United States dollars are not to be governed by the laws of Cuba as to the method of performance. Pan-American Life Insurance Co. v. Recio, Fla., 154 So.2d 197, cert. den. 377 U.S. 990, 84 S.Ct. 1908, 12 L.Ed.2d 1044, reh. den. 379 U.S. 871, 85 S.Ct. 17, 13 L. Ed.2d 78; Pan-American Life Insurance Co. v. Lorido, Fla., 154 So.2d 200, cert. den. 377 U.S. 990, 84 S.Ct. 1905, 12 L.Ed. 2d 1043, reh. den. 379 U.S. 871, 85 S.Ct. 15, 13 L.Ed.2d 77. See Confederation Life Association v. Ugalde, Fla., 164 So. 2d 1. Therefore, for the law governing performance, we look to state rules for our guides. The Zabaleta policy, originally payable in New Orleans and by endorsement made payable in Cuba, falls into a separate category.
 
 
 12
 The Supreme Court of Louisiana has held that the laws and decrees of Cuba passed subsequent to the date of the policy could have no effect upon the obligation existing at the time of the expropriation. Theye y Ajuria v. Pan-American Life Insurance Co., 245 La. 755, 161 So.2d 70, cert. den. 377 U.S. 997, 84 S.Ct. 1922, 12 L.Ed.2d 1046, reh. den. 379 U.S. 872, 85 S.Ct. 20, 13 L.Ed.2d 79. Whether or not it was intended by the Cuban government to relieve the appellant insurers of their obligations to discharge the contracts according to the stated terms, while it assumed a new and different obligation, we think it could not do so in any manner which, by the act of state doctrine or otherwise, would prevent recovery by the owners of the policies here in suit. The Cuban expropriation was intended to accomplish two things with respect to the appellant insurance companies; first, to take over their Cuban assets, and second, to obligate the Cuban state for the liabilities of the companies at least to the extent of their confiscated capital. It is difficult to see how the seizure of the assets of the insuring obligors would of itself change the rights of the insured obligees to be paid at the places and in the currency stipulated. Recovery is not precluded by the act of state doctrine. The contractual rights of Blanco, Conill and Diego were not expropriated and probably could not have been. See Banco Nacional de Cuba v. Sabbatino, supra, 376 U.S. at p. 413, 84 S.Ct. 923.
 
 
 13
 When the Blanco case was before this Court on an interlocutory appeal it was urged by Pan-American that the rights of Blanco to payment in the United States became unenforceable by Cuban Law No. 858 requiring payments to Cuban nationals to be made in Cuba in pesos, and that this law is valid under the Bretton Woods International Fund Agreement. The effect, if any, of the Agreement was not decided on the former appeal. 311 F.2d 424, 427. Since the case was before us Cuba has withdrawn from the International Monetary Fund and is no longer a party to the Agreement. This being so, a judgment on the policies will not be precluded by the Agreement. See Stephen v. Zivnostenska Banka National Corporation, 140 N.Y.S. 2d 323; aff. 286 App.Div. 999, 145 N.Y.S. 2d 310. Even though this were not so, the Bretton Woods Agreement would not be applicable to contracts such as the insurance policies here involved. Theye y Ajuria v. Pan-American Insurance Co., supra.
 
 
 14
 It follows that the judgment of the district court in the Blanco and Conill cases will be affirmed. In the Diego case, where the policies provided for payment in pesos in Galveston, the district court found that the parties intended for payment at an official exchange rate of one dollar for each peso and concluded that recovery should be had on this basis. Our attention has not been directed to any evidence in support of this finding. Although it appears that the peso, before Castro, was pegged at a dollar, the then prevailing exchange rate was not specified in the policies and neither the district court nor this Court should write it into the contracts. To support his position of one peso equals one dollar, Diego makes reference to Huntley v. Alejandre, Fla., 139 So.2d 911, where it is said:
 
 
 15
 The appellants have also urged error in the failure of the trial judge to render judgment in pesos, or its equivalent in American currency. Assuming [which we do not here decide] that the trial court should have entered its judgment in pesos, or its equivalent in American currency [see: Revillon v. Demme, 114 Misc. 1, 185 N.Y.S. 443], this point is not well taken by the appellants as the record reveals that the official rate of exchange was equal and the appellants have offered no evidence to the contrary. Therefore, the final judgment is affirmed. 139 So.2d at 912.
 
 
 16
 The inapplicability of the language quoted is shown by a more recent Florida case in which this language appears:
 
 
 17
 The Huntley case is not authority for the proposition that the official rate should prevail in the present case. There was no evidence, in the Huntley case, of any commercial rate which was different from the official rate, and the case involved an obligation to pay pesos in Cuba. It was therefore appropriate that a judgment upon the transitory action should provide for payment in United States dollars equivalent to the pesos at the place of payment provided in the contract. American National Insurance Co. v. de Cardenas, Fla., 181 So.2d 359, 361.
 
 
 18
 In the de Cardenas case, as in the Diego case, American National contracted to make payment of its policy obligation in Galveston, Texas, in Cuban pesos. There, as here, the trial court held that recovery should be had on the basis of one dollar for each peso. In this case, as in the de Cardenas case, there was evidence of a market for and sales and purchases of Cuban pesos. In de Cardenas the Florida court held that judgment should have provided for payment in dollars equivalent to pesos at the prevailing rate of exchange. The same holding must be made here. The Diego judgment must be reversed with directions to enter judgment in accordance with the views here expressed.
 
 
 19
 The Zabaleta situation presents a somewhat different problem. There has been no admission of liability on the part of Pan-American to pay in pesos, or their equivalent fixed by any standard, in Cuba or elsewhere. Cf. Confederation Life Association v. Ugalde, Fla., 164 So.2d 1, cert. den. 379 U.S. 915, 85 S.Ct. 263, 13 L.Ed.2d 186, reversing Fla.App., 151 So.2d 315. On the contrary, Pan-American has taken and adhered to the position that the Cuban expropriation laws have absolved it from performance. This position, as we have said in discussing the other cases, is unsound. Miss Zabaleta should be permitted to maintain her action and should recover. The district court permitted recovery on a dollar for a peso basis. This conclusion was reached, as in the Diego case, on the "official exchange rate" theory with which we have disagreed in Diego and must disagree with respect to Zabaleta. The district court also reached the conclusion that the one for one ratio was contemplated by the parties and made a part of the terms of the policy amendment. We are unpersuaded that, in 1952, when the amendment was made, it was contemplated by the parties that demand might be made for payment in dollars. Rather, we think, it was intended by the parties to change the obligation to pay a stated number of dollars to an obligation to pay a stated number of pesos, and this without regard to future variations in the respective values of the two currencies. In our opinion Miss Zabaleta should recover on the same basis as Diego, with her judgment measured by the dollar value of the pesos which she is entitled to have awarded under the policy provisions.
 
 
 20
 The judgments of the district court in Pan-American Life Insurance Company v. Blanco, 20942, and Pan-American Life Insurance Company v. Conill, 20944, are affirmed. The judgments in American National Insurance Company v. Diego, 20955, and in Pan-American Life Insurance Company v. Zabaleta, 20943, are reversed for further proceedings in accordance with this opinion.
 
 
 
 Notes:
 
 
 [1]
 Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed. 2d 804
 
 
 [2]
 22 U.S.C.A. § 2370(e) (2)
 
 
 [3]
 "Policies" refers to annuity contracts as well as to life insurance contracts
 
 
 [4]
 Notwithstanding any other provision of law, no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party including a foreign state (or a party claiming through such state) based upon (or traced through) a confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law, including the principles of compensation and the other standards set out in this subsection. Provided, that this paragraph shall not be applicable (1) in any case in which an act of a foreign state is not contrary to international law or with respect to a claim of title or other right to property acquired pursuant to an irrevocable letter of credit of not more than 180 days duration issued in good faith prior to the time of the confiscation or other taking, or (2) in any case with respect to which the President determines that application of the act of state doctrine is required in that particular case by the foreign policy interests of the United States and a suggestion to this effect is filed on his behalf in that case with the court. 22 U.S.C.A. § 2370(e) (2)