## ARMINAN v. CONFEDERATION LIFE ASSOCIATION.

No. 66-C-2707.

Circuit Court, Dade County.

March 27, 1967.

Thomas B. DeWolf, Miami, for plaintiff.

Cotton Howell of Shutts & Bowen, Miami, for defendant.

HAL P. DEKLE, Circuit Judge.

*Opinion and order on motion for summary judgment:* The above cause, coming on to be heard on the motion of the plaintiff for summary judgment, and the motion of the defendant for summary judgment, and the court being fully advised in the premises, the court makes the following findings of fact —

1. The plaintiff is a resident of Dade County, Florida, and is sui juris. The defendant is a Canadian insurance corporation authorized to do business in Florida and doing business in Florida, with its principal place of business in Toronto, Canada.

2. This court has jurisdiction of the subject matter and the parties hereto.

3. On or about February 28, 1928, the defendant, for a valuable consideration, executed and delivered to the plaintiff

its insurance policy no. 273630 in the city of Havana, Cuba, while the plaintiff was a resident of Cuba. The defendant agreed to insure the life of the plaintiff for the sum of $5,000, and agreed that the value of the cash or surrender value of the policy after an interval of twenty years had passed would be a sum in the amount of $5,825 if the plaintiff made yearly payments from February 14, 1928, the date of issuance of the policy, until February 14, 1947, making a total of twenty yearly payments in the sum of $242 per payment. The plaintiff duly paid all the premiums required to be paid by the terms of the policy of insurance, and the policy is still in force and effect.

4. All of the premium payments were made in United States dollars in Havana, Cuba.

5. On or about July 1, 1951, the government of Cuba enacted and put into effect decree no. 1384. Law no. 568 was enacted and became effective on or about October 2, 1959, in Cuba, and law no. 930, was enacted and became effective in Cuba on or about February 23, 1961. The said laws and decrees are generally known as the Cuban Monetary Control Laws, and have the effect of requiring that all obligations payable in Cuba be paid in Cuban pesos.

6. On or about March 7, 1961, in the city of Miami, plaintiff duly demanded of the defendant payment of the said cash surrender value of the policy, as of that date, according to the schedule oppearing on page 2 of the policy. The defendant refused and still refuses to pay the cash surrender value in any place other than in Havana, Cuba, and in any currency other than Cuban pesos.

7. The plaintiff was a resident of Cuba on or about January 1959, when a violent revolution took place in Cuba by which the lawful government of Cuba was deposed and a revolutionary government seized power and has since that time maintained its power over Cuba as the *de facto* government. Because of the plaintiff's opposition to the revolutionary government, the plaintiff could no longer remain in Cuba without great fear for his life and safety, and the lives and safety of his family and did, therefore, on or about September 2, 1960, depart from Cuba and take up residency in the United States in the city of Miami. Plaintiff is now a permanent resident of the state of Florida and was granted permanent immigrant registration no. A-12-447-101, on or about June 2, 1964, by the United States government. The plaintiff is prevented from entering Cuba because of fear for his life or imprisonment at the hands of Cuba.

8. Plaintiff proceeded, at law, on or about April 27, 1961, in an action against the defendant on insurance policy no. 273630 in the circuit court in and for Dade County, no. 61-L-1651, wherein a final order of dismissal, without prejudice, was entered on January 14, 1965, by the circuit judge, leaving the plaintiff without remedy in a court of law.

9. The defendant has, and still maintains, that it will pay to the plaintiff the cash surrender value of the policy, but only in Havana, Cuba, in Cuban pesos, and has refused to pay the said sum in the United States to the plaintiff in United States dollars.

10. The plaintiff was required to, and did, employ the attorneys of record in this cause to institute suit on his behalf to recover the said sums and has thereby become obligated to pay his attorneys a reasonable attorney's fee for their services.

11. The terms of the policy provide, *inter alia,* that —

(a) "all payments under this policy will be in legal tender of the United States of America",

and that —

(b) "all payments under this policy whether by the company or the insured shall be made in the City of Havana, Cuba; except that the insured may, with the consent of the company, make his payments elsewhere."

### Opinion

The court, in view of the foregoing findings of fact, is of the opinion that a court of equity should grant the plaintiff the relief which he seeks.

The Florida Supreme Court in Confederation Life Association v. Ugalde, 164 So. 2d 1 (Fla. 1964), held that the Florida courts were obligated by the International Monetary Fund Agreement to apply the Cuban Monetary Laws to contracts payable in Cuba, and because the defendant offered to make payment of the cash surrender value of the policies in issue in accordance with the law of Cuba in Cuban pesos in Havana, there was no breach of contract and a Florida court could not require payment here or in any other currency. The defendant argues that the *Ugalde* decision bars the plaintiff's action here because it has offered to make payment in Cuban pesos in Havana, Cuba.

The law is relative and must relate to *current* conditions. The condition, or predicate, upon which *Ugalde* rests is expressed in that opinion as being the then existing International Monetary

Fund Agreement (Dec. 27, 1945, 60 Stat. 1401, T.I.A.S. 1501) which, the court expressly held, *obligated* the Florida courts — "***to apply the cited Cuban laws to the contract there involved***." These laws were, of course, the often cited Legal Tender Law of 1948 (Cuban law no. 13, Dec. 23, 1948, effective in 1951 by decree no. 1384), and Cuban law no. 930 of February 23, 1961, prohibiting contract payments in other than Cuban pesos as the only legal tender, and Cuban law no. 568 on October 2, 1959, which forbade the export of currency or transfer of funds abroad.

Article VIII (2) (h) of the International Monetary Fund Agreement (or treaty) binds each of the signatory nations to enforce the monetary regulations of the other.

Subsequent to *Ugalde,* on April 3, 1964, Cuba withdrew from the International Monetary Fund treaty and thus removed the reason or predicate for the holding in *Ugalde.* (In this cause the defendant does not plead nor rely upon the International Monetary Fund Agreement). The courts of Florida and of the United States are, therefore, no longer bound or to be guided by said Cuban laws but may now freely apply American principles of law and equity. Blanco v. Pan American Life Insurance Company, (S.D. Fla. 1963) 221 F. Supp. 219, 226; Pan American Life Ins. Co. v. Blanco, (5th Cir, 1962) 311 F.2d 424. It therefore appears that the plaintiff can now obtain relief in the Florida courts for enforcement of his rights under a policy of insurance payable in Cuba. The Castro decrees have no extraterritorial effect. Cunard S.S. Co. v. Mellon, 262 U.S. 100, 101, 435 S. Ct. 504, 67 L. Ed. 894 (1923).

It may also be noted that *Ugalde* was an action strictly at *law* whereas the case *sub judice* is in *equity* and invites for the first time the consideration of equitable principles.

Even if Cuban monetary laws were still considered here, these were enacted subsequent to the final premium payments by the plaintiff which vested his rights prior to such abrogating Cuban Laws.

Although plaintiff might be unable to recover any meaningful amount at law, he may by a suit in equity recover what is admittedly due him under the policy. The case of Secombe v. Steele, 61 U.S. (20 How.) 833 (1858), gives the following rule at page 836 —

> At law, if there is an express agreement for the payment of the purchase money, and the delivery of the conveyance of the land by a particular day, and at a particular place, the parties will be bound

by it, and time will be of the essence to the contract . . . Time may be made of the essence by the contract by express stipulation, or it may become essential by considerations arising from the nature of the property, or the character of the interest bargained. And the principle of a court of equity does not depend upon considerations collateral to the contract merely, nor on the conduct of the parties subsequently, showing that time was not of the essence of the contract in the particular case.

But it must affirmatively appear that the parties regarded time or place as an essential element in their agreement, or a court of equity will not so regard it.

In *Parkin v. Thorold*, 16 Beav. 59, the Master of the Rolls said: "A contract is undoubtedly construed alike both in equity and at law; nay, more — a court of law is a proper tribunal for determining the construction of it. But courts of equity make a distinction in all cases between that which is a matter of substance and that which is a matter of form; and if it finds that, by insisting on form, the substance will be defeated, it holds it to be inequitable to allow a person to insist upon such form, and thereby defeat the substance. For instance, *A* has contracted to sell an estate to *B*, and to complete the title by the 25th of October; but no stipulation is introduced, that either party considers time of the essence of the contract. *A* completes the title by the 26th; at law, the contract is at an end, and *B* may bring an action for the non-performance of the contract, obtain damages for the breach; but equity holds, that unless *B* can show that the delay of 24 hours really produced some injury to him, he is not permitted to bring this action or to avoid the performance of the contract; not, certainly on the grounds that the 25th of October was not a part of the contract, but on the grounds that it is unjust that *B* should escape the performance of a contract which has been substantially performed by *A*, by reason of some omission in a formal but immaterial portion of it."

Defendant asserts that if plaintiff were to collect United States dollars from the defendant it would be a "transaction in foreign exchange" prohibited under the Cuban Assets Control Regulations, and thus, defendant would be committing a felony under the laws of Cuba. However, the defendant would not be making a *payment* under the contract sued upon, but instead there would be an execution by the plaintiff by levy on the assets of the defendant. Moreover, this court cannot under any circumstances give extraterritorial effect to Cuban criminal regulations.

Florida Statutes (§624.0221) provide expressly that as a condition prerequisite to doing business in the state of Florida, a foreign corporation consents to the appointment of the treasurer of the state of Florida as its agent for the service of process. In addition, such foreign insuror must post a cash reserve or otherwise prove some financial responsibility (§624.0210). If it can be served with process in the state of Florida, and if a cash

reserve or equivalent is required of it as a prerequisite to do business, it must follow that judgment may be entered against such company and such judgment collected as any other judgment regardless of the place fixed for performance in the insurance contract. The cause of action is transitory. Confederation of Canada Life Insurance Company v. Vega y Arminan, Fla. App. 1961, 135 So. 2d 867, cert. denied with opinion, 144 So. 2d 805; Clay v. Sun Insurance Office, Ltd., 363 U.S. 207, 80 S. Ct. 1224, 4 L. Ed. 2d 1170.

Plaintiff is now a permanent resident of Florida and of the United States and not in the role of a Cuban national which was the case in *Ugalde* and other earlier decisions. The court is also aware that many of those who first fled from the tyranny of the Castro government are now citizens of the United States. It is inconceivable that these new Americans should, if the defendant's point were to be sustained, be required to return to Cuba to collect that which is rightfully due them, and, as this plaintiff, be unable safely to do so, while defendant's coffers bulge with bullion rightly theirs.

The insurance company next argues that if it is required to respond to a judgment entered by this court, it will be penalized in that it will be required to pay twice, once here and once in Cuba. This argument is fallacious in that it presumes that the Cuban courts will not give recognition to the decrees of this court, validly entered in accordance with all principles of international law. The court will not indulge such a presumption at the expense of the policyholder.

Neither does it appear that the defendant insurance company cannot pay the plaintiff without violating the Cuban law. The policy makes no reference to being paid *solely* out of assets located physically in Cuba. Blanco v. Pan American Life Insurance Company, *supra*. Thus, it is distinguishable from the policies involved in the so-called Russian insurance cases. See Dougherty v. Equitable Life Assurance Soc., 266 N.Y. 71, 193 N. E. 89 (1934). In the Russian cases, the policies clearly set forth that the parties agreed to be governed by Russian law and were to be paid solely from Russian assets.

Equity imputes an intention to fulfill an obligation. The obligation in this case is the benefit due by the defendant to the plaintiff under his policy.

In equity, various maxims consisting of broad general rules or principles are recognized and enforced; they are subject to limitations and exceptions, and one maxim may limit or restrict

the use of another, or a combination of several maxims may control the decision. Equity seeks to do justice and avoid injustice, and is not bound by strict common law rules. A court of equity is a court of conscience; it seeks to do justice in equity between all parties; it seeks to strike a balance of convenience as between litigants; and it looks at the whole situation. It does not act unless justice and good conscience demand that relief should be granted, and acts only in accordance with conscience and good faith. It is particularly well known that equity seeks to prevent unjust enrichment, and will not permit one to be enriched unjustly at the expense of another.

It is stated in 30 C.J.S., *Equity*, §103, p. 1066, (1965) —

> [E]quity devises means for enforcing a lawful result, when legal procedure is inadequate. In a broad sense the maxim means that equity follows the law to the extent of obeying it and conforming to its general rules and policies whether contained in the common or statute law. While the maxim is true as a general rule, equity does not always follow the law. Equity follows the law only so far as the law goes in securing the rights of the parties. Although the maxim has frequently been given as a reason for refusing to create rights or liabilities unrecognized at law when not justified by equitable considerations, the maxim does not apply in those matters which entitle a party to equitable relief, although the strict rule of law is to the contrary, and must be considered together with the maxim, . . . that equity will not suffer a wrong to be without a remedy.

Equitable jurisdiction is best summed up by the following found in 30 C.J.S., *Equity*, §105, p. 1070, (1965) —

> Equity will not suffer a wrong, or, as sometimes stated, a right, to be without a remedy and this maxim includes the whole theory of equity jurisdiction, and affords relief whenever a right exists and no adequate remedy at law is available.

As was pointed out in Secombe v. Steele, supra, equity regards substance rather than form. The maxim, or its substantial equivalent, that regards substance rather than form has been frequently stated and applied. Bruce's Juices v. King, 61 So. 2d 175 (Fla. 1952). In Schupler v. Eastern Mortg. Co., 33 So. 2d 586 (Fla. 1948), Justice Barnes stated, at page 592 —

> Equity regards the substance, and not the form: "The maxim, equity regards substance rather than form, is expressed in various ways and stresses the intent or spirit of the case. A court of equity, it is said, will look to the circumstances and not to the form of the transaction."

In the instant case there is no doubt that the plaintiff would have an absolute right to a meaningful recovery were it not for the revolution in Cuba. The only portion of the insurance con-

tract with which the plaintiff cannot literally comply is the requirement that payment be made to him in Havana. The fact that Cuba, subsequent to the inception and full payment of the contract, enacted a monetary control regulation requiring all payments which are made in Cuba to be made in Cuban pesos, may prevent the plaintiff's recovery at law. However, applying the maxim that equity looks at the substance rather than the form of the transaction and since the primary purpose of this transaction is the payment of the cash surrender value of the policy after a period of twenty years, and the provision of payment being made in Havana is merely for the convenience of the parties, there is no equitable reason why the plaintiff should not recover.

Therefore, it is ordered, adjudged and decreed that — (1) The defendant's motion for summary judgment is denied. (2) The plaintiff's motion for summary judgment is granted on the issue of liability. (3) Plaintiff shall set a further hearing in this cause to determine the exact amount due for the cash surrender value of this insurance policy sued on and the amount of attorney's fees to be awarded to the plaintiff.