Martin E. **OLIVA**, as Administrator C.T.A. of the Estate of Pedro Menendez, also known as Pedro Menendez Rodriguez, deceased, Plaintiff-Appellee, Cross-Appellant,

v.

**PAN AMERICAN LIFE INSURANCE COMPANY, a Louisiana corporation, Defendant-Appellant, Cross-Appellee.**

Martin E. **OLIVA**, as Administrator C.T.A. of the Estate of Pedro Menendez, deceased, Plaintiff-Appellee,

v.

The **AETNA INSURANCE COMPANY**, a Connecticut corporation, Defendant-Appellant.

Nos. 29264, 29318.

United States Court of Appeals, Fifth Circuit.

June 22, 1971.

Rehearing Denied July 13, 1971.

---

William A. Gillen, Fowler, White, Gillen, Humkey & Kinney, P.A., Tampa, Fla., for defendant-appellant, cross-appellee.

John P. Corcoran, Jr., Tampa, Fla., for plaintiff-appellee, cross-appellant.

Before JOHN R. BROWN, Chief Judge, and WISDOM and MORGAN, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Though Fidel Castro has now been in power over twelve years, his take-over of the Cuban Government continues to raise legal wrangles. In these two cases, we must again determine the effect of Cuban expropriation decrees upon Cuban citizens who have fled to seek refuge in the United States. Since both cases here concern the application of the act of state doctrine and both involve the same person, they will be considered together.

The two cases were dismissed separately by the District Court upon the doctrine of forum non conveniens in 1961. This Court consolidated the appeals, reversed each decision and remanded for determination of other issues raised by the pleadings. Rodriguez v. Pan American Life Ins. Co., 5 Cir., 1962, 311 F.2d 429; Menendez v. Aetna Ins. Co., 5 Cir., 1962, 311 F.2d 437. The Supreme Court of the United States granted certiorari, vacated the judgment of this Court and remanded the case for "further consideration in the light of Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804," 376 U.S. 779, 781, 84 S.Ct. 1130, 1131, 12 L.Ed.2d 82. After a further hearing we remanded the case for the District Court "to afford the parties opportunity to be heard upon development of such record as is found necessary by the District Court for its determination of the applicability of the Act of State doctrine." Rodriguez v. Aetna Ins. Co., 5 Cir., 1965, 340 F.2d 708. In 1969 the District Court granted summary judgment to Plaintiffs in both cases, and defendants appeal under the act of state doctrine.

The original plaintiff was Pedro Menendez.[1] Mr. Menendez was a Cuban

---

1. Mr. Menedenz died in 1969. His administrator Martin Oliva has been substituted as party plaintiff.

resident until 1959. In Cuba he had been a successful tobacco farmer. In 1958 he was elected to the Cuban Senate and became Minister of Agriculture to President Fulgencio Batista. In early 1959 Mr. Menendez fled Cuba and became a resident of Tampa, Florida. But he had not become a forgotten man in Havana. In March, 1959 the new Government declared certain former Batista supporters to be traitors and that these people would have their property confiscated. On April 7, 1959 the Government published the name of Mr. Menendez in the *Official Gazeta,* and he thereby became such an individual.

### No. 29264—Pan American

The first claim deals with a life insurance policy that Mr. Menendez purchased from the Pan American Life Insurance Company, a Louisiana corporation, in 1945. At the time Pan American did business both in the United States and in Cuba. Among the provisions of the policy was that "all the payments * * * be they on the part of the company or the insured will be verified in the City of New Orleans in the legal money of the United States." The policy provided for automatic premium loans if the premiums were not paid for the surrender of the policy for its cash value.

In 1951 American currency ceased to be legal tender in Cuba and thereafter all obligations contracted or payable in Cuba were required to be settled in Cuban currency. Pursuant to this Pan American sent notice in 1952 to all of its policyholders that it could no longer accept payment in dollars in Cuba. Pan American then offered two options: (i) payments in New Orleans must be made in dollars or (ii) payments made in Cuba must be made in pesos. Menendez signed a notice selecting (ii) which provided payment "on the basis of one Peso for every Dollar payable under the con-

tract, it being agreed that upon receipt at the Pan American Life Insurance Company of this application, said application shall form an integral part of the contract executed between the undersigned and the Company."

From 1952 until 1958 all payments were made and accepted in pesos in Cuba. Mr. Menendez did not make the premium payment due on January 5, 1959, but this payment was made pursuant to the automatic loan provision of the policy. In September 1959 Mr. Menendez attempted to pay the loan against the policy by sending a check on a Tampa bank to Pan American's office. In October Pan American returned the check explaining that it was against company policy to transfer a policy from Cuban pesos to American dollars automatically. It suggested that if any changes were to be made Mr. Menendez must send his policy to the Pan American branch in Havana and request the cash surrender value. If and when this was accomplished, Mr. Menendez would be allowed 20 days to contact Pan American in the United States and the company would then reinstate the policies in United States currency in consideration for the surrender of the cash value of the policy which Mr. Menendez received from Cuba.[2] The letter went on to say as long as the policies were payable in pesos, Mr. Menendez would be required to make all payments through the Cuban office.

Mr. Menendez recognized that such a course of action would be futile and therefore did not accept Pan American's offer. In July 1960 he requested payment of the cash surrender value of the policies in United States dollars, and shortly thereafter Pan American again offered what it had offered before—to pay the value of the policies in pesos in Cuba. In August 1960 Mr. Menendez instituted suit in state court in Florida for the cash surrender value, and Defendant removed the case to federal

---

2. This would have been impossible since in September 1959 the Cuban Government enacted Law No. 568 to prevent the flight of funds payable in Cuba in pesos.

court. Finally in September 1960 the Cuban Government requested that Pan American pay the confiscated cash surrender value of the policy to the Ministry of the Treasury. Pan American surrendered the proceeds of the policy to the Government in Cuba which in turn absolved Pan American from all further liability on the policy.

### No. 29318—Aetna

This case deals with a fire insurance policy issued in Cuba in 1952 by Aetna Insurance Company, a Connecticut corporation. The policy originally named Cuban Land and Lease Tobacco Company, in behalf of Pedro Menendez as the assured. The policy insured barns and their contents used by Mr. Menendez in his tobacco business. In 1957 the policy was changed to name Mr. Menendez as the sole insured party.

On November 20, 1958, while the policy was in effect, a fire destroyed some of the insured property. Mr. Menendez promptly reported the loss but no settlement or adjustment had been reached by January 1, 1959 when Fidel Castro seized power.

The new Cuban Government required Aetna to assess the loss. Then, in accordance with its confiscation decree against Menendez, the Government expropriated Menendez's claim by selling some of the securities that Aetna had deposited to gain the right to do business in Cuba. The Cuban Government retained the proceeds and in January 1960 absolved Aetna from further liability on Mr. Menendez's fire loss. Aetna had previously informed Mr. Menendez that it would be unable to repay him for any claims arising from his Cuban fire insurance policy.

### Act of State Doctrine

■ In Pan-American Life Insurance Company v. Blanco, 5 Cir., 1966, 362 F. 2d 167, this Court considered the claims of several Cuban refugees seeking recovery on insurance policies that had been expropriated by the Cuban Government. The claim of Mrs. Zabaleta in *Blanco* is identical to the life insurance case here. We follow *Blanco* and hold that the act of state doctrine does not preclude recovery. We likewise believe that on the principles leading the Court to the decision in *Blanco*, the fire insurance case is indistinguishable from that of Mrs. Zabaleta. This case too deals not with the seizure of tangible property within Cuba but with an attempted expropriation of Oliva's contractual rights. These rights "were not expropriated and probably could not have been. See Banco Nacional de Cuba v. Sabbatino * * * 376 U.S. at p. 413, 84 S.Ct. 923." *Blanco*, 362 F.2d at 170.[3]

### Conversion to Pesos

■ The District Court converted the cash surrender value in pesos into dollars at the exchange rate prevailing when demand was made on the life insurance company.[4] The assured on this appeal urges that he is entitled to one dollar for every peso.[5] Again following *Blanco's* treatment of the two policies belonging to Zabaleta and Diego, we must reject this contention and affirm the District Court. When the policy was converted to one payable and receivable in pesos in 1952, we think the clear intent of the parties was to change an obligation payable and receivable in dollars to one payable and receivable in an equal number of pesos, for dollars and

---

3. On oral argument the parties agreed that we need not consider the effects on the act of state doctrine of the so-called Sabbatino Amendment, 22 U.S.C.A. § 2370(e)(2). We therefore pretermit any discussion of this point.

4. At that time a peso was worth 32½ American cents.

5. A similar conversion was made in the judgment award on the fire insurance policy. But this conversion was not appealed by the assured.

pesos at that time were equivalent in value. See *Blanco,* 362 F.2d at 172.

### Attorney's Fees

In both cases the District Court awarded attorney's fees to the assured under Fla.Stat.Ann. § 627.0127.[6] But Pan American points out that the limitations on § 627.0127 found in Fla.Stat. Ann. § 627.01001(2)[7] apply and make attorney's fees unrecoverable. We agree that the policies sued on here fall within the exception and reverse the award of attorney's fees.

■ In an instance of interpreting state law, the goal of the federal courts is to try to get the same result that would be reached in the state courts. The Florida Supreme Court has not spoken on the interpretation of § 627.-01001(2), but two intermediate appellate courts have. These two courts are in direct conflict with each other, with the latter decision expressly disavowing the former. General Insurance Company of America v. Roth, Fla.Dist.Ct. of Appeal (3d Dist.), 1970, 233 So.2d 662 upheld attorney's fees while Fuentes v. Pan American Life Insurance Co., Fla.Dist. Ct. of App. (4th Dist.), 1971, [Case Nos. 70–206 and 70–207, March 12, 1971] denied them. Although certification to the Florida Supreme Court to resolve the conflict would be effective, the statutory language in its amended form is so plain that we feel confident in hazarding our informed guess.

In *Roth* the District Court of Appeals was faced with a claim for attorney's fees on an insurance policy issued and delivered in Ohio. The Court followed Fellar v. Equitable Life Assurance Society, Fla., 1952, 57 So.2d 581 and Fidelity-Phenix Fire Insurance Company of New York v. Cortez Cigar Company, 5 Cir., 1937, 92 F.2d 882, 885 and held that fees could be recovered. But these two authorities were interpretations of the Florida law as it stood before 1959. The old law provided for attorney's fees on any insurance contract sued on in Florida with no mention made of the new delivery requirement of § 627.-01001(2). In *Fellar* and *Cortez* the issue was whether this fee provision applied to policies sued on in Florida but delivered in another state, and the Courts decided that delivery was not to be engrafted onto the statutory requirements. But as *Fuentes* points out the 1959 amendment was obviously designed to limit the number of cases in which attorney's fees were recoverable when it added that the policy must be issued for delivery or delivered in Florida. The Court concluded that *Roth* mistakenly relied on a statute that had been superseded by later amendments.[8]

In making our choice, we think *Fuentes* is not only correct, but is the only one which interprets the statute (see notes 6 and 7, *supra*) in its present form. It is therefore the last word. Ford Motor Co. v. Mathis, 5 Cir., 1963, 322 F.2d 267. Florida had no connection to these insurance policies until after the assured had fled to Florida.

---

6. "Upon the rendition of a judgment or decree by any of the courts of this state against an insurer and in favor of an insured or the named beneficiary under a policy or contract executed by the insurer, the trial court, or, in the event of an appeal in which the insured or beneficiary prevails, the appellate court shall adjudge or decree against the insurer and in favor of the insured or beneficiary a reasonable sum as fees or compensation for the insured's or beneficiary's attorney prosecuting the suit in which the recovery is had."

7. "No provision of part II of this chapter [of which § 627.0127 is a part] shall apply as to:

\* \* \* \* \*

(2) Policies or contracts not issued for delivery in this state nor delivered in this state \* \* \*."

8. This unfounded reliance is by no means unique to the state courts. In Kellogg Co. v. Aetna Casualty & Surety Co., S.D. Fla., 1968, 282 F.Supp. 955, a federal court reached the same interpretation that *Roth* did. But it took no notice of the delivery requirements of § 627.01001 (2); instead the decision reached the result on the basis of the prior statute that had no mention of delivery.

■ The District Court found that the policies were to be delivered in Cuba. It gave no reason for an award of attorney's fees in the fire insurance case, but granted fees in the life insurance case because "the contracts involved here were formed by the plaintiffs' acceptance of the cash surrender value options of the policies. Under the controlling Florida decisions the contracts were. made in Florida." But the statute makes it clear that the standard is where the contracts are "delivered" not where they are "made." And since the policy was not delivered in Florida, Florida law does not permit us to award attorney's fees. Celanese Coatings Co. v. American Motorists Insurance Co., S.D.Fla., 1969, 297 F.Supp. 598.

To summarize:

The decision that the act of state doctrine does not preclude liability is affirmed.

The decision that the peso value of the policies should be converted into the dollar equivalent on the date of demand is affirmed.

The award of attorney's fees is reversed.

Affirmed in part; reversed in part.

