FOURNET, Chief Justice.
 

 Carlos Manuel Theye Y Ajuria, a Cuban national now residing in Florida
 
 [1]
 
 , instituted proceedings in the district court in Orleans Parish against Pan American Life Insurance Company, a Louisiana corporation, to recover the cash surrender value of an insurance policy issued by the defendant on the life of the plaintiff, which under the terms of the contract, had been converted into a fully paid-up policy in June, 1942. He also prayed for penalties and attorneys’ fees.
 

 In answer to the plaintiff’s petition, the defendant (1) denied the policy was a Louisiana contract and governed by the laws of this state, insisting that the policy was in fact delivered to him by its agent in Cuba whose laws govern the performance thereof; and maintained (2) that even if the original contract had been consummated in Louisiana, its situs had been removed to Cuba by the actions of the parties, the defendant having paid and the plaintiff having received the persistency bonus in 1948 in Cuban pesos, and the
 
 *760
 
 plaintiff having made and repaid in pesos three loans on the policy in 1948, 1950, and 1952; and (3) under our “Act of State” doctrine and certain provisions of the International Monetary Fund, commonly known as the Bretton Woods Agreement, a treaty to which Cuba and the United States are signatories, the laws of Cuba
 
 [2]
 
 passed since the execution of the policy involved herein govern.
 

 Whereupon, the plaintiff filed a motion for a summary judgment on the pleadings, exhibits, interrogatories and defendant’s response thereto; the motion was granted and the trial judge awarded the plaintiff the sum of $7,090 as the cash surrender value of the policy. This judgment was reversed by the Court of Appeal, Fourth Circuit, dismissing plaintiff’s suit, 154 So.2d 450. The matter is now before us for review on a writ of certiorari granted on the application of the plaintiff.
 

 The record reveals that on May 14, 1928, when plaintiff was thirty-one years of age, he applied for a life insurance policy through the defendant’s agent in Havana, to which was attached payment of the first annual premium. In due time the application was received and accepted by the defendant in its home office in New Orleans; the policy was issued on May 22, 1928, and mailed to its said agent in Cuba to be delivered to the plaintiff. All other annual premiums were also paid in United States currency until 1942 when the policy was converted into a paid-up one.
 

 It is stipulated in the policy, a copy of which was attached to the plaintiff’s petition, that all premiums are payable in advance at the home office of the defendant and upon presentation of the policy, it would “ * * * pay at its Home Office in New Orleans, Louisiana, U.S.A., and upon presentation of due proof of the death * * * ” of the insured, the proceeds of the policy to the beneficiary.
 

 The trial judge in his reasons for judgment stated that the obligation under the contract at the time it was issued and at the time it" was converted was governed
 
 *762
 
 by the laws of the state of Louisiana and the laws and decrees of the Republic of Cuba passed subsequent to these events could have no effect on the obligation that existed previously. In reversing the judgment of the district court, the Court of Appeal was of the opinion that the Bretton Woods Agreement prohibited this country from enforcing contracts which would frustrate exchange control regulations of another member of the Agreement, and that the Cuban law requiring that payments between the insured and the insurer be made in Cuba in pesos was applicable to the policy under consideration, consequently, the plaintiff was not entitled to recover the cash surrender value of the policy from the defendant in any of the United States.
 

 It is the settled jurisprudence of this state, a rule of law universally obtaining, that “An insurance policy is a contract and the rules established for the construction of written instruments apply to contracts of insurance.” Nyman v. Monteleone-Iberville Garage, 211 La. 375, 30 So.2d 123 and authorities cited therein. And “ * * * all the authorities agree that the law of the place of contract — lex loci contractus — as distinguished from the law of the forum, governs. The lex loci contractus, it is said, becomes as much a part of the contract as if specifically incorporated therein; and although the interpretation of the language of a contract of insurance is pre-eminently a question as to the intention of the parties, in the absence of evidence of a contrary intention the parties must be held to have contemplated the application of that law to the terms of their agreement, for the law of the state where a contract of insurance is made is necessarily within the contemplation of the parties and must be looked to in ascertaining the terms by which they agreed to be bound.
 

 “When the question of the place where a contract of insurance was made is solved, the determination of the questions as to the construction to be placed upon the terms of the contract and as to the validity thereof and of the laws which are to govern such construction and validity is comparatively easy because it is an almost universal rule that the contract of insurance must be governed by the law of the state where such contract is finally consummated. * * * ” 29 Am.Jur., Insurance, Secs. 30 and 31.
 

 Under the express provisions of the Revised Civil Code, to be found in Section 5 of Chapter 3 of Title IV, under the heading “Of the Interpretation of Agreements”, it is provided “That courts are bound to give legal effect to all * * * contracts according to the true intent of all the parties,” and such “ * * * intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences.” Article 1945. In arriving at the intent of
 
 *764
 
 the parties “All clauses of agreements are interpreted the one by the other, giving to each the sense that results from the entire act.” Article 1955. It is only when a clause is susceptible of two interpretations that it must be understood in the sense in which it may have some effect rather than in a sense that would render it nugatory (Article 1951) and only in doubtful cases that the agreement must be interpreted against the party who contracted the obligation. Article 1957.
 

 A study and analysis of the policy .and exhibits contained in the record leave no room for speculation as to the intention of the parties which was stated in clear and unambiguous language; the plaintiff obligated himself to pay all premiums due on the policy at the home office of the defendant, and after the policy was •converted into a fully paid-up one, it was the obligation of the defendant company to pay to the plaintiff the cash surrender value thereof upon his surrender of the policy at its office in New Orleans; all transactions were obviously intended to be negotiated in American dollars.
 

 This is the interpretation the defendant Itself placed on the contract when it wrote to all of its policyholders in Cuba advising them in part:
 
 “At the time your policy was issued the laws of Cuba permitted the Pan American Life Insurance Company to issue it payable in United States currency and to receive payment of premiums in Cuba in that currency.
 
 The Republic of Cuba has now enacted Law 13 of 1948 and under its terms the Government of that country has issued Decree No. 1348 of 1951 providing that the Cuban National currency shall be the only legal tender currency in Cuba. It is therefore impossible for us to continue to accept payment of U. S. Dollars in Cuba and
 
 if yo%i desire to continue the payment of your premiums in dollars they must be paid to the Home Office in New Orleans, Louisiana, as required by your contract.”
 
 (Emphasis added.)
 

 We think, therefore, the trial judge properly concluded that the laws and decrees of the Republic of Cuba passed subsequent to the date the policy became a paid-up policy can have no effect upon the obligation which existed at that time.
 

 The contention of the defendant that even if the original contract had been consummated in Louisiana the situs thereof had been removed to Cuba when the defendant paid and the plaintiff received the persistency bonus in 1948 in pesos and the plaintiff received pesos on three loans he made on the policy in 1948, 1950 and 1952 and liquidated them with Cuban pesos, is clearly without merit. There is nothing in these transactions that would indicate that the plaintiff in so acting either in receiving the bonus or making the loans intended to abrogate or modify his contract with the defendant Company. Moreover,
 
 *766
 
 the Company has failed to indicate any such intention on its part in the manner required by the contract, which specifically provides under the heading of “CONSTRUCTION OF CONTRACT” the policy could neither “ * * * be changed nor modified except with the written consent of the Company signed by the President, Vice-President, Secretary or Actuary.
 

 3¡< s{i
 

 Counsel’s last argument is that the effect of Article VIII, Sec. 2(b)
 
 [3]
 
 of the Articles of Agreement of the International Monetary Fund, which were formulated at the United Nations Monetary and Financial Conference in July, 1944 at Bretton Woods, New Hampshire, signed at Washington December 27, 1945, accepted by the United States of America December 20, 1945, and which became effective December 27, 1945, is to divest the courts of the United States of authority to enforce the obligations of the plaintiff’s contract.
 

 Conceding that Cuba had adopted the Articles thereof as part of its national law as alleged by the defendant, an exhaustive study of the Bretton Woods Agreement, as well as all authorities relied on by the defendant, fails to show where the Agreement or any of the cases are controlling under the particular facts of the case at bar inasmuch as a contract payable in the state of Louisiana in United States currency is not a foreign exchange contract.
 

 In Blanco v. Pan American Life Insurance Company, 221 F.Supp. 219, see also 311 F.2d 424, the same defenses to claims by policyholder Blanco and other Cuban refugees were urged therein as here, and in support thereof, the defendant cited the Court of Appeal opinion in the case at bar. That court concluded, however, that Federal courts are not bound by state decisions in interpreting a federal question and disposed of the matter by holding the Bretton Woods Agreement had no applicability in that case because the Cuban government lost whatever jurisdiction it possessed over not only the subject matter of the litigation but also over the persons of the plaintiffs when they fled from Cuba, became alien residents of the United States, political citizens of nowhere, but civil citizens of Florida as they were domiciled there. The court further remarked “ * * these laws (relied on by defendant) do not apply to cover the situation of a Cuban national enforcing an executory contract in the forum of another jurisdiction according to the terms of an obligation existing prior to the passage of those laws. Further, we do not believe that such laws and decrees can have any force and ■effect over the persons of these litigants who are not only without Cuba, but, as refugees, are not subject to its in personam jurisdiction. * * * ”
 

 Moreover, courts, including those of this country as well as those of foreign jurisdictions, in interpreting contracts involving matters affected by the Bretton Woods Agreement are uniform in their holding that the laws of the state or nation where the parties intended the contract to be performed govern. Menendez Rodriguez v. Pan American Life Insurance Company, 5 Cir., 311 F.2d 429, 432; Pan American Life Insurance Company v. Recio, Fla.App., 154 So.2d 197 (Florida) ; Pan American Life Insurance Company v. Raij, Fla.App., 156 So.2d 785 (Florida); Menandez v. Aetna Insurance Company, 5 Cir., 311 F.2d 437; Ahmen Bey Naguib v. Heirs of Moise Abner, abstract appears in J. T. M., No. 4003, Nov. 24/25, 1948; Kraus v. Zivostenska Banka, 187 Misc. 681, 64 N.Y.S.2d 208; Cermak, et al. v. Bata Akciova Spoiecnost, Sup., 30 N.Y.S.2d 782; Frankman v. Ango-Prague Credit Bank (London office), 1 All E.R. 337; Frankman v. Ango-Prague Credit Bank, 2 All E.R. 1025; Zivnostenska Banka National Corporation v. Frankman, 2 All E.R. 671.
 

 We find untenable the suggestion of counsel that this court should await the United States Supreme Court’s action in regard to several cases pending before it on applications for writs, and wherein the applicability of the “Act of State” doctrine in controversies similar to the case at bar is involved, and would, therefore, be controlling, before we resolve this matter. To require this refugee, who is in a strange land and possibly in dire need, to wait indefinitely for a final adjudication of his claim would be a travesty on justice; and we think it would be folly to suggest that he return to Cuba, for his effort to secure relief there might well wind up in
 
 his
 
 “liquidation.”
 

 Defendant’s contention that this is not a case for summary judgment, as well as the argument in support thereof, is unimpressive under the facts of the case.
 

 We note that in the very last paragraph of their brief plaintiff’s counsel call attention to the fact the judgment of the trial court should be reinstated “with allowance for attorney fees and expenses incurred by” plaintiff. No authority in support of these claims has been cited, and we know of none. Hence, this request must be disallowed.
 

 For the reasons assigned, the judgment of the district court is affirmed. Defendant is to pay all costs.
 

 [1]
 

 . Plaintiff had lived in Cuba until November, 1960, when he was forced to flee after Castro came to power becausé of Ms political beliefs.- ......■ -
 

 [2]
 

 . In 1948 the Batista government passed Law No. 13 which provided for the creation of the National Bank of Cuba and also that after 1951 only the Cuban pesos would be recognized as legal tender. The Monetary Law of 1951 required all contracts payable to or by 'Cuban nationals . be paid in pesos and after Castro’s rise to power, on September 29, 1959, Law 568 was promulgated, prohibiting foreign corporations doing business in Cuba, from making payments or crediting the accounts of Cuban nationals with any sums available to them except in Cuba, without the express authorization of the National Bank of Cuba. In June, 1960, Law No. 851 was adopted, providing for the nationalization through expropriation of all property in Cuba owned by United States nationals and pursuant to Resolution Number 3, passed October 26, 1960, defendant’s operations were expropriated and an administrator appointed by the Cuban government was placed in charge thereof. ...
 

 [3]
 

 . “Exchange contracts which involved the currency of any member and which are contrary to the exchange control regulations of that member maintained or imposed consistently with this Agreement shall be unenforceable in the territories of any member. In addition, members may, by mutual accord, cooperate in measures for the purpose of making the exchange control regulations of either member more effective, provided that such measures and regulations are consistent with this Agreement.” Article VIII, See. 2(b) International Monetary Fund.