**A. B. PENDLETON**

v.

**AETNA LIFE INSURANCE COMPANY.**

**Civ. A. No. 68–1904.**

United States District Court,
E. D. Louisiana,
New Orleans Division.

Dec. 17, 1970.

Peter H. Beer, Harold B. Carter, Jr., Montgomery, Barnett, Brown & Read, New Orleans, La., for plaintiff.

Timothy G. Schafer, Adams & Reese, New Orleans, La., for defendant.

HEEBE, District Judge:

Plaintiff Abram B. Pendleton brings this suit seeking recovery of certain disability payments allegedly due him under defendant Aetna Life Insurance Company's Accident and Health Policy No. GL60110; an order directing Aetna to make such payments in the future; recovery of statutory damages and attorney's fees; and recovery of damages for mental anguish and anxiety allegedly caused by Aetna's failure to make the requisite payments.

For many years prior to 1966, plaintiff had been employed as an airline pilot by Delta Air Lines, Inc., and its predecessors. In February of 1966 plaintiff developed an eye disease which caused the irrevocable loss of about ninety per cent of his vision. Both parties agree that plaintiff is totally and permanently disabled from flying within the meaning of the policy.

The policy in question is a group insurance policy which Delta obtained in September of 1964 to cover all its employees. Pursuant to its provisions, plaintiff properly claimed, and was awarded beginning August 17, 1966, disability benefits of $888.98 a month. On July 25, 1966, plaintiff notified Aetna that he would receive disability benefits of $554.83 a month, which in fact commenced December 1, 1966, under Delta's Retirement Fund. This Fund had become effective January 1, 1966.

Plaintiff continued receiving $888.98 from Aetna until July 27, 1967, at which time Aetna informed plaintiff that due to Aetna's misinterpreting its own contract, it had overpaid plaintiff some $4,-

886.48.[1] Aetna claimed the policy required that the disability benefits plaintiff received from Delta's Retirement Fund be offset from the disability benefits due plaintiff under Aetna's policy. Because Aetna had failed to make the offset, it had overpaid plaintiff. Plaintiff disputed this interpretation and refused to return the alleged overpayment. Aetna then suspended all payments to plaintiff, whereupon, amicable demand failing, plaintiff instituted this suit.

## I. CHOICE OF LAWS

■ We are first confronted by the problem of what state's law to apply in this suit brought in Louisiana by a Louisiana resident against a Connecticut corporation over an insurance contract negotiated in Georgia and Connecticut between the Connecticut corporation and a Georgia corporation (Delta), delivered in Georgia, and containing a clause requiring the contract to be construed according to Georgia law.[2] Sitting in a diversity case, this Court is bound to apply the conflicts rules of the forum state. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Erie R. Co. v. Tomkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Lester v. Aetna Life Insurance Co., 433 F.2d 884 (5th Cir. Oct. 28, 1970). In Johnson v. St. Paul Mercury Insurance Co., 256 La. 289, 236 So.2d 216 (1970), the Louisiana Supreme Court emphatically rejected over thirty years of modern thought and modern authority in favor of the much condemned and "archaic" rule of *lex loci.* Johnson v. St. Paul Mercury Insurance Co., *supra,* at 225, (dissenting opinion of Mr. Justice San-

ders). Hence, we must apply the *lex loci contractus* in deciding the contract questions before us. Lester v. Aetna Life Insurance Co., *supra.* For insurance contracts, Louisiana recognizes the law of the state where the policy was delivered as the *lex loci contractus.* Theye y Ajuria v. Pan American Life Ins. Co., 245 La. 755, 161 So.2d 70, cert. den. 377 U.S. 997, 84 S.Ct. 1922, 12 L.Ed.2d 1046 (1964); Davis v. Insurance Company of North America, 268 F.Supp. 496 (E.D. La.1967). Here, both parties agree that the policy was delivered in Georgia; hence Georgia law will apply to all contract issues.

Likewise, *lex loci delicti,* the law of the place where the wrong occurred, governs all tort questions in Louisiana. Johnson v. St. Paul Mercury Insurance Co., *supra.* This plaintiff resided in Louisiana after his disability, and any injury arising out of his dealings with Aetna occurred in this state. Hence, Louisiana law will be applied to all tort questions.[3]

## II. INTERPRETATION OF THE POLICY

The narrow questions we are asked to decide are whether the relevant provisions of the contract are ambiguous, and if they are, how are those provisions to be construed. ·

■ A basic premise of the law of Georgia, and indeed of most jurisdictions, is that an insurance policy is to be construed strictly against the insurer. United States Fidelity & Guaranty Co. v. Woodward, 118 Ga.App. 591, 164 S.E.2d 878 (1968); State Farm Fire & Casualty Co. v. Rowland, 111 Ga.App. 743, 143 S. E.2d 193 (1965); 13 J. A. Appleman,

---

1. Aetna first claimed an overpayment of $4,866.48; then later computed the amount to be $3,358.61.

2. Defendant contends that this Court must apply Georgia law to all substantive issues since the parties (without the consent of the Court) stipulated before trial that Georgia law governs. This Court, however, is bound not by the stipulation of the parties but only by the choice of law rules of Louisiana. 2 J. Beale, The Conflict of Laws 1079-86 (1935). *See*

*generally,* Q. R. Cramton & D. Currie, Conflict of Laws 148–171 (1968).

3. We think the choice of·law questions to be somewhat meaningless since research indicates that application of either law would lead to the same result. This, therefore, is a false conflict. Lester v. Aetna Life Insurance Co., *supra; see generally,* B. Currie, Married Women's Contracts: A Study in Conflict of Laws Method, 25 U.Chi.L.Rev. 227 (1958).

Insurance Law and Practice, § 7401 (1943) and cases cited therein. However, where the lawful intent of the parties is clear and unambiguous from the face of the policy, then the court must effectuate that intent. Pilot Life Insurance Co. v. Morgan, 94 Ga.App. 394, 94 S.E.2d 765 (1956); Great American Indemnity Co. v. Southern Feed Stores, 51 Ga.App. 591, 181 S.E. 115 (1935); 13 J. A. Appleman, Insurance Law and Practice, § 7402 (1943) and cases cited therein. Here, we find the relevant provisions of the policy so ambiguous that no clear intention is readily ascertainable.

The essential purpose of the relevant provisions of the policy was to provide a disabled employee with a monthly benefit of 50% of his average monthly earnings less "the amount, if any, of other income benefits (defined below) for the same monthly period * * *." Policy Art. II § 2, p. 6b. Other income benefits were defined as including

"* * * the amount of any benefit provided with respect to a disability

(i) under any labor-management plan or union welfare plan or employer or employee benefit organization plan providing *benefits for loss of time from employment because of disability,* and

(ii) under any fund or other arrangement providing benefits for loss of time because of disability pursuant to any compulsory benefit act or law * * *." Art. II § 2(c), p. 6c. (emphasis supplied)

This benefit was to terminate at the earliest of several occurrences including "the date the employee commences to receive *a benefit under the Retirement Plan* of a Participant Employer," Art. II § 2(d) (VI), p. 6a. (emphasis supplied)

The resolution of the dispute between these parties depends on where in this scheme the disability benefits plaintiff received from Delta's Retirement Fund fit. We think these provisions are subject to several different interpretations, each resulting in a different benefit due plaintiff:

(1) Strict interpretation of the termination clause.

"[A] benefit under the Retirement Plan" is construed as including disability benefits and not just retirement benefits. This would result in all of plaintiff's benefits under the policy being terminated upon receipt by the plaintiff of any disability benefits under Delta's Retirement Fund.

Plaintiff gets nothing.

(2) a. Liberal interpretation of the termination clause.

"[A] benefit under the Retirement Plan" is construed as including only retirement benefits from the Fund and not disability benefits.

b. Strict interpretation of the offset provision.

"Benefits for loss of time from employment because of disability" is construed as including permanent disability benefits from a retirement fund and not just benefits for a temporary disability which results in a "loss of time."

Delta's benefits are offset and plaintiff gets $201.45.

(3) Liberal interpretation of both provisions.

The termination clause is not triggered by disability benefits but only by retirement benefits, and the offset provision applies only to disability benefits for time lost (i. e., temporary disability) and not to permanent disability benefits.

Delta's benefits are not offset and plaintiff gets $888.98.[4]

While some of these interpretations are more reasonable than others, we think them all possible and hence must find the relevant provisions of the contract ambiguous. The conflict be-

---

4. Aetna apparently adopted first interpretation (1) and then interpretation (2). See letter to plaintiff dated August 25, 1967. Plaintiff has consistently adopted interpretation (3).

tween the termination clause and the off-set provision is a patent ambiguity. Clearly, if the termination clause applies to these benefits, the offset provision is rendered meaningless since the reception by plaintiff of any disability benefits under Delta's Retirement Plan would trigger the termination clause and leave plaintiff with no benefits from which to offset the other income benefits. The policy does not state on its face which provisions applies when. The conflicting interpretations of the offset provision demonstrate a latent ambiguity—one that is not evident until one attempts to ascertain whether a permanent disability benefit from Delta's Retirement Fund is a benefit "for loss of time from employment because of disability." The fate of these ambiguities is likewise determined by well settled legal propositions.

"In construing ambiguous provisions of an insurance policy words are given an intendment favoring the insured and the interpretation most favorable to coverage of the insured will prevail." United States Fidelity & Guaranty Co. v. Woodward, *supra*, 164 S.E. 2d at 880.

*Accord*, State Farm Fire Co. v. Rowland, *supra*; Hartford Accident & Indemnity Co. v. Grant, 113 Ga.App. 795, 149 S.E.2d 712 (1966); Warwick v. Supreme Conclave Knights of Damon, 107 Ga. 115, 32 S.E. 951 (1899); 13 J. A. Appleman, Insurance Law and Practice, § 7401 (1943) and cases cited therein.

▉ Construing this policy strictly against the insurer and liberally in favor of the insured, we interpret this policy as requiring Aetna to pay plaintiff, as a disability, fifty per cent of his average monthly earnings without allowing Aetna to either terminate the benefits or offset the disability payments received from Delta as other income.

▉ The same result is reached by using parole evidence to clarify these ambiguities. While parole evidence is ordinarily inadmissible to prove that an ambiguity in a written contract exists, once an ambiguity has been found, it is ad-missible to explain or clarify that ambiguity. 20 Ga.Code Anno. § 704; 9 Wigmore on Evidence, §§ 2465, 2472 (3rd Ed. 1940). Unaided by extrinsic evidence, we have already determined that there exist two ambiguities, one patent and one latent, in this policy, and we will now resort to parole evidence to clarify these ambiguities.

At the trial plaintiff introduced evidence proving that in January 1967 Aetna changed the disputed provisions of the policy. Disability payments could now be terminated at the earliest of several times including "the date the employee commences to receive a benefit *other than a disability benefit* under the Retirement Plan of a Participant Employer," Art. II § 2(d) (VI), p. 6a. (emphasis supplied)

The monthly benefit was now subject to an offset for other income benefits including

" * * * the amount of any benefit provided, whether or not applied for and received, with respect to a disability

(i) under any labor-management plan or union welfare plan or employer or employee benefit organization plan providing benefits for loss of time from employment because of disability,

(ii) under any fund or other arrangement providing benefits for loss of time because of disability pursuant to any compulsory benefit act or law; and

(iii) *under a retirement plan * *.*" Art. II § 2(c), p. 6c (emphasis supplied)

Clearly, under the amended policy, Aetna would have treated plaintiff's retirement disability benefits as they in fact did under the original policy, not terminating his policy benefits but offsetting Delta's benefits and paying plaintiff $201.45.

While several conflicting inferences may be drawn from this amendment, we think an inference that the original policy did not handle disability benefits as they are handled now is certainly permis-

sible. If this method of handling disability payments were crystal clear under the original provisions, one wonders why Aetna would have bothered amending the policy.

Moreover, Mrs. Evelyn Smith, the Aetna employee who drafted the original policy, testified that in her opinion the original offset provision did not include disability benefits under a retirement plan and that receipt of such disability payments would not trigger the operation of the original termination clause. Smith Deposition, at 22.

Construing the ambiguous provisions of the policy liberally in favor of the insured and in accordance with the clarifying extrinsic evidence, we hold that under the original policy Aetna could not terminate payments upon receipt by plaintiff of the disability payments from Delta's Retirement Fund nor could Aetna offset those payments as "other income." Accordingly, plaintiff is entitled to receive fifty per cent of his average monthly earning less any permissible offsets.[5]

■ Plaintiff further claims that Aetna erred in computing his average monthly earnings. Aetna, he claims, used the average of his earnings during the three months prior to his disability, during which time his earnings were less than average since he was rearranging his schedule to accommodate his vacation. Had Aetna averaged his earnings during normal working months, his disability payments would have amounted to $942.63 instead of the $888.98 he received.

However justified this contention might be, it must fail for the policy requires in Art. II § 2(f) that

" * * * the term 'monthly rate of basic earnings' with respect to flight personnel shall be determined by dividing, by three, the total basic earnings of such employee during the full three calendar month period immediately preceding the date of the commencement of the period of total and permanent disability."

Where a policy provision is clear and unambiguous, this Court must enforce it. Pilot Life Insurance Co. v. Morgan, *supra*; Great American Indemnity Co. v. Southern Feed Stores, *supra*.

### III. PENALTY STATUTE

Plaintiff seeks recovery of damages and attorney's fees under a Georgia statute which allows their recovery against an insurer who refuses in bad faith to pay for a loss within sixty days after a demand has been made. 56 Ga.Code Anno., § 1206. The Georgia courts, characterizing this as a penal rather than a remedial statute, have interpreted the statute very narrowly in favor of insurance companies. Thus, "[r]efusal to pay in bad faith means a frivolous and unfounded denial of liability. If there is any reasonable ground for the insurer to contest the claim, there is no bad faith. Dependable Ins. Co. v. Gibbs, 218 Ga. 305, 316, 127 S.E.2d 454, 461; Gulf Life Ins. Co. v. Howard, 110 Ga.App. 76(3), 137 S.E.2d 749." United States Fidelity & Guaranty Co. v. Woodward, *supra*. Moreover, bad faith does not exist when the refusal to pay is predicated on the insurer's interpretation of a doubtful question of law ultimately resolved against it. United States Fidelity & Guaranty Co. v. Woodward, *supra*; Brown v. Seaboard Lumber & Supply Co., 221 Ga. 35, 142 S.E.2d 842 (1965).

■ While we may not necessarily feel that Aetna has here acted in the best of faith, we cannot say that their conduct, predicated as it was on their legal interpretation of their own policy, constitutes the bad faith contemplated by the Georgia statute. Hence, plaintiff cannot recover damages or attorney's fees under this statute.

### IV. DAMAGES

Plaintiff seeks to recover $50,000 for mental pain and suffering he allegedly

---

5. Aetna's offset under subsection (ii) of plaintiff's social security benefits as other income is not here in dispute.

suffered as a result of defendant's actions. He argues that after blindness set in, a major comfort in his life was his belief that, having proper insurance coverage, he was financially secure. Aetna aided this belief by paying him for eleven months the payments he deserved. He, in turn, relied on this security by making certain financial commitments including the purchase of a farm. Aetna's sudden switch in interpretation removed this comfort from his life and caused him much suffering and anxiety.

We are not clear whether plaintiff's theory of recovery sounds in contract or in tort. However, a separate consideration of each theory shows that plaintiff can recover under neither.

 Plaintiff cannot recover under a tort theory for he has failed to show that Aetna breached a legal duty which it owed him independently of its contractual duties. Dean Prosser sums up his analysis of the developing field of tort actions arising from breaches of contract this way: "The principle which seems to have emerged * * * is that there will be liability in tort for misperformance of a contract wherever there would be liability for gratuitous performance without the contract." Prosser on Torts, § 81 (2d Ed. 1955). Had no contractual relationship between the parties existed, Aetna would not be liable here for any damages since the only duty plaintiff claims defendant breached was Aetna's duty to use reasonable care in interpreting and performing its contract.

Plaintiff cites a number of Louisiana cases which have allowed recovery in tort for a breach of contract. Regardless of the broad language and fuzzy analysis

appearing in some of these cases, we think them in accord with this rule for the defendant had generally breached an independent legal duty he owed to the plaintiff separate and apart from his contractual obligation.[6]

 Nor can plaintiff recover contract damages for mental anguish caused by defendant's actions. The general rule does not allow such damages unless defendant's actions were wanton or reckless or unless the promisor had reason to know when making the contract that a breach would cause mental anguish for reasons other then mere financial loss. Restatement, Contracts, § 341; 5 Corbin on Contracts, § 1076 (1951).[7]

We have already found defendant's actions not wanton and believe that, unlike a contract to bury a corpse or deliver death messages, this insurance contract does not fall within the second exception to the general rule. Plaintiff has not cited, nor have we found, any Georgia authority changing this rule to allow recovery in this situation. Plaintiff does cite several cases which have allowed a plaintiff to recover damages where the insurer undertook the defense of an action and then failed to accept a reasonable settlement thereby exposing the insured to an excess liability judgment. State Farm Mutual Automobile Ins. Co. v. Smoot, 381 F.2d 331 (5th Cir. 1967); United States Fidelity & Guaranty Co. v. Evans, 116 Ga.App. 93, 156 S.E.2d 809 (1967). Recovery there, however, was not in contract but, as plaintiff himself states in his memo, for " 'negligent breach of a contract' which sounds in tort." Both insurers had an independent legal duty to conduct the defense they

---

6. *E. g.,* Boudreaux v. Allstate Finance Co., 217 So.2d 439 (La.App.1968) (independent duty of finance company not to use inappropriate means to collect debt); Holland v. St. Paul Mercury Insurance Co., 135 So.2d 145 (La.App.1961) (manufacturer of dangerous substances has independent duty to properly label them); Mitchell v. Shreveport Laundries, 61 So. 2d 539 (La.App.1952) (laundry having accepted suit for cleaning, had independent duty to return it before wedding).

7. "If the mental suffering for which a claim is made is caused wholly by mere pecuniary loss and disappointment, it is believed that damages for such suffering should always be refused. Pecuniary deprivation may reduce one to poverty and bankruptcy, and the humiliation and mental discomfort may be very great; but thus far, damages are not awarded for such humiliation and discomfort." 5 Corbin on Contracts, § 1076.

had undertaken in the common interest of the company and the insurer, a duty they breached by rejecting reasonable settlements. As stated earlier, Aetna was under no such independent duty; hence, these cases do not support plaintiff's recovery.

Plaintiff will prepare a proposed judgment in accordance with this opinion and submit it to opposing counsel for approval within one week. It should be submitted to the Court, with the approval of the defendant or with a statement of the grounds of his opposition, within three days thereafter. Upon submission of the proposed judgment, a judgment will be entered in favor of the plaintiff.