281 So.2d 779 (1973)
Antonio Mouriz FERNANDEZ
v.
PAN-AMERICAN LIFE INSURANCE COMPANY.
No. 5454.
Court of Appeal of Louisiana, Fourth Circuit.
May 10, 1973.
Sessions, Fishman, Rosenson, Snellings & Boisfontaine, Robert E. Winn and Suzanne Antippas, New Orleans, for plaintiff-appellee.
G. Frank Purvis, Jr., Matthew R. Sutherland and Solomon S. Goldman, New Orleans, for defendant-appellant.
Before REGAN, BOUTALL and SCHOTT, JJ.
BOUTALL, Judge.
This is a suit by an insured against his insurer seeking the cash surrender value of a life insurance policy. The trial court awarded judgment to plaintiff in the amount of $1,454.62 which it determined to be the cash surrender value. The defendant insurer appealed and plaintiff has answered the appeal seeking a larger amount.
The facts are either stipulated by the parties or are uncontested, and we set them out as follows.
*780 The Pan-American Life Insurance Company, defendant-appellant, is a mutual life insurance company domiciled in New Orleans, Louisiana. It had been engaged in writing life insurance on the lives of Cuban nationals in the Republic of Cuba since 1913. At the times pertinent herein, it operated through a branch office in Havana, Cuba. Although it originally wrote policies payable in U.S. dollars at the home office of the company in New Orleans, beginning in 1946 it issued policies in Cuba only payable in Havana in legal currency of Cuba (pesos).
Antonio Mouriz Fernandez (the original plaintiff, now deceased) was a Cuban national, and while residing in Cuba, he applied for and received in 1949 a Twenty Thousand Peso Policy[1] issued by Pan-American insuring his life for that amount, and containing additional benefits such as policy loan provisions and automatic payment of premium provisions with options of paid-up insurance or cash value on surrender of policy at a rate stated in the policy. The application was to, and the policy issued and delivered by the Havana office, with notarial certificate endorsed thereon by a Cuban notary public as required by the laws of that country. The policy provided that:
"All payments, whether by the Company or the insured should be made in Havana in legal currency of Cuba."
The premiums on the policy were payable annually and the insured duly paid eleven such premiums in Cuban pesos at the Havana office. The last payment (due January 28, 1960) was paid March 3, 1960. Since payments were made in advance, the policy remained in effect by payment of premiums until January 1961, at which time the next annual premium was due. However, no premiums were paid thereafter, the policy being kept in force under the paid-up life insurance provisions, until the exercise of the option to cancel and receive the cash value. It might also be noted that in March, 1958 the insured made a policy loan of 8340 pesos and repaid the loan in pesos.
Several months before the last premium payment, the Cuban Government (now under the control of the Castro forces) promulgated Law No. 568 on September 29, 1959, under which it prohibited Pan-American, indeed all U.S. legal entities, from paying money to any Cuban national anywhere except in Cuba, or even making any credits available to Cuban nationals except in Cuba.
Several months after the last premium payment, in June, 1960, Law No. 851 was adopted, providing for the seizure and expropriation of all property and businesses in Cuba owned by U.S. legal entities and the substitution of the Cuban Government in their place. Acting under the authority of Law No. 851, the Cuban Government promulgated Resolution No. 3 on October 26, 1960, under which it expropriated specific businesses, one of which was Pan-American's Life Insurance business, and an administrator appointed by the Cuban Government was placed in charge. This was accomplished by the physical ousting of defendant's Havana Manager from his office and replacement by the administrator, and by the retaining of all other employees until they were later released and replaced. The business of the branch office was then conducted in the usual fashion, except that the company's name was changed to indicate nationalization and the governmental agency completely assumed the role of Pan-American's home office.
For years prior to the nationalization of its Cuban business, Pan-American had retained more than sufficient assets in Cuba to cover all of its liability and obligations on its policies and suffered a severe loss as a result of the seizure. It estimates that *781 this loss was greater than any profits it may have been able to return to the U.S. in prior years.
Plaintiff fled Cuba on June 13, 1962, coming to Louisiana. He subsequently demanded the cash surrender value of his policy seeking payment in U.S. dollars in New Orleans. Pan-American refused payment insisting that the Cuban Government had completely taken over its policy and was in fact, and as provided by the Cuban law, paying all insureds who surrendered their policies.[2] Plaintiff then filed suit on March 31, 1967. During the proceedings he died and the Administratrix of his Succession was substituted plaintiff. The District Court rendered judgment in favor of plaintiff for a sum equivalent in U.S. dollars of the Cuban peso cash surrender value of the policy at the prevailing exchange rate on date of demand. This appeal by defendant followed.
The primary issue is the application of the laws of Cuba to the policy. An examination of the facts related above and of the policy itself clearly shows that this is a policy entered into and delivered in Cuba and all of its obligations and terms were to be executed in Cuba. If the pertinent Cuban laws are controlling herein, it is clear that there is no responsibility upon defendant to pay because the Cuban Government has assumed its liabilities and placed itself as the insurer and obligor under the policy. It is equally apparent that, notwithstanding the substitution, Cuban law requires payment in Cuban pesos in Cuba.
Since Castro's government was on January 5, 1959 recognized by the United States as the legal government of Cuba, and it still is, we are faced with the question of whether we can inquire into the validity of those laws. The U.S. Supreme Court in Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) has announced that the classic American statement of the act of state doctrine is still binding upon our courts, quoting Underhill v. Hernandez, 168 U.S. 250, p. 252, 18 S.Ct. 83, at p. 84, 42 L.Ed. 456:
"Every Sovereign State is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves." 84 S.Ct. 923 at p. 924.
Applying the rule thus announced in Sabbatino, supra, we would be required to recognize the validity of the Cuban laws and hold that Pan-American was no longer the insurer but instead the Cuban government was. For an excellent analysis of such a result, we refer to the case of Present v. United States Life Insurance Company, 96 N.J.Super. 285, 232 A.2d 863, affirmed, 51 N.J. 407, 241 A.2d 237 without opinion. Of course, the holding in that case is not binding on us, merely persuasive.
We are referred to the case of Theye y Ajuria v. Pan-American Life Insurance Company, 245 La. 755, 161 So.2d 70, (1964) which, being a pronouncement of the Supreme Court of Louisiana, is controlling upon us. At the outset we must point out that the facts in that case and in our case differ in material aspects. The policy of insurance in Theye was determined on its facts to be a Louisiana contract and governed by the laws of this State. The contract there provided that all payments would be at the home office in New Orleans, Louisiana in U.S. dollars. Consequently the court ruled that Louisiana law applied and that any attempted change by the Cuban Government upon a Louisiana contract, the performance of which was stipulated to be in Louisiana, *782 could have no effect. In determining that the policy was a Louisiana contract, the court set out the rules for determination of applicable law to such policies of insurance, and we are required to follow those rules. We quote the following significant language, 161 So.2d 72:
"It is the settled jurisprudence of this state, a rule of law universally obtaining, that `An insurance policy is a contract and the rules established for the construction of written instruments apply to contracts of insurance.' Nyman v. Monteleone-Iberville Garage, 211 La. 375, 30 So.2d 123 and authorities cited therein. And `* * * all the authorities agree that the law of the place of contractlex loci contractusas distinguished from the law of the forum, governs. The lex loci contractus, it is said, becomes as much a part of the contract as if specifically incorporated therein; and although the interpretation of the language of a contract of insurance is pre-eminently a question as to the intention of the parties, in the absence of evidence of a contrary intention the parties must be held to have contemplated the application of that law to the terms of their agreement, for the law of the state where a contract of insurance is made is necessarily within the contemplation of the parties and must be looked to in ascertaining the terms by which they agreed to be bound.
"`When the question of the place where a contract of insurance was made is solved, the determination of the questions as to the construction to be placed upon the terms of the contract and as to the validity thereof and of the laws which are to govern such construction and validity is comparatively easy because it is an almost universal rule that the contract of insurance must be governed by the law of the state where such contract is finally consummated. * * * ` 29 Am.Jur., Insurance, Secs. 30 and 31."
Applying these rules then to the contract in question, and considering the facts which we have set out hereinabove, we must conclude that the policy in our case is a Cuban contract. The contract was delivered in accordance with the Cuban law, and certified thereunder, and became effective upon the payment of the first premium which was of course, payable in Cuba in pesos. Every obligation to pay on either party in this contract is specified to be in Cuba in pesos, and during the entire course of the contract this is what was done. We find no vagueness or ambiguity in the pertinent sections of the contract, and it was clearly the intention of the parties that the enforcement of the contract was to be in Cuba. It is further noted that at the time of this contract being written in 1949, that there was in existence a 1948 law setting up the Bank of Cuba and requiring that, beginning in 1951, only Cuban pesos would be legal tender. Since this is a 20 year policy, under no stretch of the imagination could it be contended that the parties intended anything other than payment in Cuban pesos.
Counsel for plaintiff has additionally referred us to several cases of the State Courts of Florida and of the Federal Judicial System, which he feels are determinative of the issues posed herein. It may be noted however that Florida decisions may be found on both sides of the question. Confederation Life Assn. v. Ugalde, 164 So.2d 1 (Fla.Sup.Ct.1964) cert, denied. 379 U.S. 915, 85 S.Ct. 263, 13 L.Ed.2d 186 (1964), takes the same view as we take. Later, in Confederation Life Assn. v. Vega y Arminan, 207 So.2d 33 (D.C.App.Fla.1968), affirmed per curiam 211 So.2d 169 (Sup.Ct.Fla.1968), cert, denied, 393 U. S. 980, 89 S.Ct. 450, 21 L.Ed.2d 441 (1968), the court distinguished Ugalde and reached a contrary result. A reading of the decision in that case convinces us that the difference in result was reached because of the Vega case coming from a court of equity, and equitable principles were applied, whereas in Ugalde, the law was applied. *783 It is difficult for us in Louisiana to recognize such a distinction. However, we must point out that the policy in the Vega case was written not by a U.S. insurance company, but by a Canadian insurance company, and there was no seizure of Canadian insurance company assets or policies. Therefore it would be reasonable to suppose that since the insured had paid the necessary premiums, that he should be allowed recovery else the insurer be unjustly enriched. However this situation does not apply in cases relating to United States insurance companies, whose assets have been confiscated by the Cuban Government.
As to the Federal authorities to which we have been referred, we can only say that there appears to be a difference of opinion amongst various Federal courts as to the application of the law in particular cases. The United States Court of Appeals, 5th Cir., has considered two cases involving this same defendant, and has permitted suit and recovery in U.S. currency. In the case of Pan-American Life Insurance Co. v. Blanco, 362 F.2d 167 (5th Cir. 1966), the court considered a claim under a policy issued by Pan-American to a certain Zabaleta. In that case the policy was originally written payable in dollars in New Orleans, Louisiana, but was later changed to be payable in Havana in Cuban currency as a result of the change in Cuban law. In Blanco, the court announced that it was relying upon the application of Louisiana law as pronounced in Theye, supra, and applied Louisiana law to the policy stating that subsequent changes by the Cuban Government could have no effect upon the policy.
In a later case, Oliva v. Pan-American Life Insurance Company, 448 F.2d 217 (5th Cir. 1971) the court, in dealing with a policy that stated that all of the payments be verified in the City of New Orleans in legal money of the United States, the court made a similar holding and permitted recovery in accordance with the terms of the policy. At the same time that court held that the Act of State Doctrine did not apply to an insurance situation such as here.
An examination of those cases and of similar cases shows that in each case the Federal Court was attempting to apply the State Law as it recognized it to the policy and thus reach a decision consistent with State Law.
Following the guidelines as laid down by our Supreme Court in the case of Theye y Ajuria v. Pan-American Life Insurance Company, supra, we have concluded that the policy in question is a Cuban policy and that Cuban law is applicable thereto. Under Cuban law, the policy is payable in Cuba in the national currency of Cuba. In fact it makes no difference whether we apply Cuban law or simply apply the law of the contract itself because it provides for the same payment as does the Cuban law. However, this brings us to face a problem concerning the availability of this type of payment under this policy. It would appear that such a method of payment is of no practical value to the insured, since it is highly unlikely that he could retrieve from Cuba the money thus paid. Thus, in addition to merely stating that the contract required such payment, we must necessarily examine into the later Cuban laws which affect this contract in order to determine if such payment should be made by this defendant.
The policy provisions are such that the insured could demand a cash surrender value of his policy any time after the third policy year. Of course the more premiums that are paid in, the higher the cash surrender value gets. If the insured had demanded a cash surrender value prior to the enactment of the present Cuban laws in 1959 and 1960, we would conclude that the contractual obligation between the parties had thus come into fruition, and that any subsequent laws could not change the status as it existed on the date that demand was made for the cash surrender value. In such instance it would appear to us that we would be required to hold, that *784 because of the impossibility of payment in accordance with the contractual terms, that the insurer would be required to pay the equivalent dollar value of the policy here in Louisiana. However, such is not the case. The policy was still in existence being operated under the payment of premiums at the time when the Cuban Government passed the law nationalizing the defendant's insurance business, seizing its assets and its policies and placing itself in defendant's stead. After this time, the plaintiff was still a Cuban national, domiciled therein, and the defendant was a foreign insurer doing business subject to the laws of Cuba. Ordinarily a sovereign government has the right to regulate the business of insurance within its borders and it must be conceded that even in Louisiana, the statutory law prevails over contrary provisions in an insurance policy. Certainly the Cuban Government had authority over its own national, the insured, and its laws should control his rights under the insurance policy. We refer to the case of Dougherty v. Equitable Life Assurance Society, 266 N.Y. 71, 193 N.E. 897 (1934) for a similar result involving Russian insurance policies.
Surely it was the intention of the parties at all times under this policy of insurance to have all policy contract and activity take place in Cuba. We do not see how the personal decision of the plaintiff, because of his difference in political views with the Cuban Government, to flee that country and reside in the United States, could unilaterally change the performance of the acts required by the policy. Since he was still residing in Cuba at the time of the enactment of the pertinent laws, the Cuban law did not permit him to continue to have a policy issued by a U. S. company. His leaving that jurisdiction could not be a basis to avoid the application of Cuban law to a Cuban contract. The Cuban Government, by the substitution of itself in the place of the insurance company, did not deprive him of the right to collect under his policy, but only of the right to proceed against the named insurer. Concerning the merits of such a substitution, we note that the evidence shows that more than sufficient assets of the insurer were seized and made available to those persons insured in order to guarantee payment of all of their claims. We realize that the mere seizure by the Cuban Government of the defendant's assets would not be sufficient to relieve the insurer of its obligation to pay under the policy, because its obligation is such that it is required to pay from its total assets, rather than simply from its assets held in Cuba for that purpose. The crux of this matter, as viewed from the Cuban standpoint, is that the Cuban Government decided, at a time when this Cuban insurance policy was in force under operation of Cuban law, that its nationals, who are subject to Cuban law, should be deprived of doing business with United States insurance companies, and instead should do their insurance business with the Cuban Government. By substituting itself in place of the defendant insurer, and by assuming all liabilities existing under the policy, the Cuban Government effectively terminated the liability of the defendant under the policy. See Present v. United States Life Insurance Company, supra.
For the foregoing reasons, we are of the opinion that there is no liability on the part of the defendant insurer under this policy, and accordingly it is ordered that the judgment appealed from is now annulled and reversed, and there is judgment herein in favor of defendant-appellant Pan-American Life Insurance Company and against the plaintiff-appellee, Leodora Castellanos Rodriguez, administratrix of the Succession of Antonio Mouriz Fernandez, dismissing plaintiff's suit at his costs.
Reversed and rendered.
NOTES
[1] The policy is in the Cuban language, as are various premium receipts and notices placed in evidence. English translations have been furnished. The policy was reconstructed from the files of Pan-American.
[2] It is stipulated that by Cuban Law No. 1193 of July 22, 1966 the Cuban Government ordered the liquidation of the nationalized companies, including defendant.