**LAKE CHARLES HARBOR & TERMINAL DISTRICT**

v.

**IMPERIAL CASUALTY AND INDEMNITY COMPANY and Granite State Insurance Company.**

**Civ. A. No. 84–2200–LC.**

United States District Court, W.D. Louisiana, Lake Charles Division.

Sept. 28, 1987.

Michael K. Dees, McHale, Bufkin & Dees, Lake Charles, La., for plaintiff.

Philip E. Henderson, Robert L. Morris, Houma, La., for defendants.

## OPINION

VERON, District Judge.

The Lake Charles Harbor & Terminal District brings this suit, with jurisdiction based upon diversity of citizenship and amount in controversy, against Imperial Casualty & Indemnity Company and Granite State Insurance Company ("the defendant insurers") claiming that the defendant insurers in accordance with the terms, limits, and conditions of their policies should pay for the repair, etc. of a bulk cargo mechanical loading device referred to as the "ship loader" necessitated by damage which occurred in the incident of August 4, 1983.

The defendant insurers acknowledge that their policies were in full force and effect at the time of the incident but deny liability on the basis of the "mechanical breakdown exclusion" in their policies.

The case has been bifurcated; only the issue of liability under the policies is presently before the court.

## THE FACTS

The factual evidence relative to the issue of liability is before the court by way of a joint stipulation.

The pertinent facts, as reflected in the stipulation and the documentation attached thereto, are as follows:

The incident at issue occurred August 4, 1983 at the Lake Charles Harbor & Terminal District bulk terminal. As of that time, the machine in question had been in use at that facility for approximately ten years.

The ship loader is a machine in some respects similar to a large gantry crane. It has four legs. At the bottom of each leg is a set of railroad wheels. The ship loader can move in a side-to-side direction on the railroad tracks which are set along the dock at the bulk terminal. About thirty feet above ground level in the ship loader is a "shuttle" or "boom" which is a rectangular steel framework about fifty feet long and ten feet tall. This shuttle is perpendicular to the dock; the waterside end of the shuttle extends out over the water. The shuttle can be extended further out and/or brought back by means of a motor in the ship loader. The motor causes a large three-cable drum to reel in or reel out cables which cause the shuttle to move inward or outward. The shuttle runs inward and outward along railroad tracks which are within the ship loader housing and are, as indicated previously, about thirty feet above ground level. The shuttle runs on an approximate twelve degree incline with the higher end toward the water.

Within the shuttle is a continuous conveyor belt. Another conveyor belt drops powdered or bulk material onto the rear or landward end of the shuttle conveyor belt, and the shuttle conveyor belt then brings

the powdered or bulk material to its seaward end allowing that material to drop into the appropriate hold of a ship below.

The entire operation of the ship loader is managed by one person, the operator, whose work station is in a cab which is within the ship loader and is located above the shuttle. The operator can cause the entire machine to run side to side along the dock by use of the railway wheels which are on the dock rails. He can also cause the shuttle to move forward and back along its rails.

In the course of the loading procedure, the shuttle is moved backwards and forwards a great many times. There is a "limit switch" which automatically engages the brakes at a point shortly before the wheels would come off the end of the shuttle railroad tracks. Also, if the operator raises his foot from the "deadman brake pedal" in the cab, the brakes will automatically engage. The "brakes" stop the rotation of the three-cable drum. When the drum stops rotating the shuttle will stop moving because the cables attached to the drum hold the shuttle in place.

The machine was being operated normally at the time of the incident. As reflected in the engineering reports, the cable had worn out and parted. At the time the shuttle was out over a ship. Because it was not being held by the cables the shuttle rolled back on its rails and crashed into the back interior portion of the ship loader causing the damage which is at issue.

### THE INSURANCE POLICIES

At the time of this incident, the defendant provided comprehensive or "all-risk" insurance under two policies with identical language which is now at issue. The Imperial Casualty and Indemnity policy provides limits up to $100,000. The Granite State Insurance Company policy provides limits for over $100,000 to $24,900,000.

The policies in question provide coverage for:

"All risks of direct physical loss or damage occurring during the period of this policy."

(Exhibit #1 to Joint Stipulation, Page 1 of 12 for each of the attached policies).

A separate insuring clause is found on page 11 of 12 of each of the policies. It insures loss of earnings, as follows:

"Coverage is extended to direct loss of Gross Earning and Extra Expense resulting from:

(a) Damage to or destruction of real or personal property of the assured."

The perils which are excluded from the policies are found on page 1 and 2 of 12 of each of the policies. They read as follows:

"Perils Excluded

'This policy DOES NOT INSURE AGAINST loss caused by:

   *     *     *     *     *     *

(2) 'Mechanical or machinery breakdown; unless an insured peril ensues, and then only for the actual loss or damage caused by such ensuing peril. (This exclusion does not apply to property in transit.)"

The plaintiff contends that Exclusion 2 excepts from coverage the broken cable and losses attributable exclusively to the repair thereof, while the damage and losses caused by the roll-back of the freed shuttle is an "actual loss or damage caused by [an] ensuing peril." The defendants argue that there was no ensuing insured peril which caused damage; rather that since the entirety of the damage was to the machine itself, caused directly by its mechanical breakdown, there is no coverage.

### CONCLUSIONS OF LAW

Under Louisiana law, an insurance policy is a contract and the rules established for the construction of written instruments apply. *Theye Y Ajuria v. Pan American Life Insurance Co.*, 245 La. 755, 161 So.2d 70, *cert. denied* 377 U.S. 997, 84 S.Ct. 1922, 12 L.Ed 2d 1046 (1964). Since the policies herein were delivered in and to have effect in Louisiana, Louisiana would apply its own rules of construction. La.Civ.Code Art. 10 (1870).

The policies were issued in 1982 and are therefore to be construed according to the rules then existing, La.Civ.Code Arts.

1945–1962 (1870) (repealed).[1] Construction is neither necessary nor permitted where the words used are clear and explicit and lead to no absurd consequences. Art. 1945(3) (1870); *Harmon v. Lumbermens Mutual Casualty Co.*, 247 La. 263, 170 So.2d 646 (1965). The meanings to be employed generally are those of common usage. Art. 1946 (1870).

The term "mechanical or machinery breakdown" is in itself plain enough. It refers to "a functional defect in the moving parts of machinery which causes it to operate improperly or cease operating." *Connie's Construction Co., Inc. v. Continental Western Insurance Co.*, 227 N.W.2d 204, 207 (Iowa 1975); *National Investors Fire and Casualty Co. v. Preddy*, 248 Ark. 320, 322, 451 S.W.2d 457, 458 (1970). However, the facts of this case, namely the magnitude and consequential nature of the damage from the shuttle roll-back, raise questions of the intended scope of the concept of "breakdown," especially in light of the clause which follows:

"... unless an insured peril ensues, and then only for the actual loss or damage caused by such ensuing peril."

Therefore construction is necessary to determine how separate in character the ensuing peril must be in order for coverage to resume.

Louisiana has certain policy-based rules of construction for insurance coverage and exclusion therefrom. Generally, any doubt is to be resolved in favor of coverage; ambiguities in exclusionary clauses are construed against the insurer. *Borden, Inc. v. Howard Trucking Co., Inc.*, 454 So.2d 1081 (La.1983); *Benton Casing Service, Inc. v. Avemco Insurance Co.*, 379 So.2d 225 (La. 1979). The genesis of the rule is in La.Civ. Code Art. 1957 (1870 as amended)[2] and in the reasoning that the insured usually has little bargaining power compared to the insurer who consequently provides the policy language on a take-it-or-leave-it basis. *See, e.g., Rodriguez v. Northwestern National Insurance Co.*, 358 So.2d 1237, 1241 (La.1978); *Schonberg v. New York Life Insurance Co.*, 235 La. 461, 104 So.2d 171, 177 (1958); *Ardoin v. Great Southern Life Insurance Co.*, 186 La. 583, 173 So. 112, 114 (1937).[3]

The language of the policies at issue was developed by Mr. Thomas A. Harmon, then employed by Fred S. James and Company (FSJ). FSJ had developed similar policies for numerous other ports, and was in the business of acting as broker between port authorities and insurers who would be approached about providing coverage under the policies developed by FSJ. The final form of the policies was arrived at by discussion between port officials and the broker, a "shopping" of draft policies to various insurers, counterproposals by insurers, and ultimately a selection by bid of the insurers who were willing to provide the desired coverage at the best price. Exhibit 1, pp. 8–10, 13–17 (Deposition of Thomas A. Harmon); Exhibit 6, pp. 3–6 (Deposition of James E. Sudduth). Neither Mr. Harmon nor FSJ are parties hereto. Under the circumstances, authorship alone does not justify other than an evenhanded construction of the policy.

La.Civ.Code Art. 1947 (1870) provides:

Under the present article this rule is only reached "[i]n case of doubt that cannot otherwise be resolved." La.Civ.Code Art. 2057 (rev. 1984) and Comment.

---

**1.** These have been revised as La.Civ.Code Arts. 2045–2057 (rev. 1984). Subsequent citations to the repealed articles will note their year of enactment (1870), but not their repeal.

**2.** Art. 1957 provided that doubt must be resolved "against him who has contracted the obligation." (the obligee or insurer.) This form of Art. 1957 was the result of an amendment in 1871, reversing the effect of the original article enacted in 1870 which mandated interpretation of doubtful agreements "in favor of him who has contracted the obligation." La.Civ.Code Art. 1957 (1870) (West Compiled Edition). The 1984 revision returned to the original rule, providing for interpretation "against the obligee and in favor of the obligor of a particular obligation."

**3.** Numerous cases state the same rule regarding ambiguous policy provisions without reference to Art. 1957 or the fact of the policy language being supplied by the insurer. Public policy may well favor insurance coverage regardless of contract authorship. The result herein does not conflict with any such policy, and the analysis used is more productive than reliance on presumption for reaching the stated goal of the Civil Code, namely "the common intent of the parties." La.Civ.Code Art. 1945(3) (1870); La. Civ.Code Art. 2045 (rev. 1984).

"Terms of art or technical phrases are to be interpreted according to their received meaning with those who profess the art or profession to which they belong."

La.Civ.Code Art. 1952 (1870) provides: "Terms, that present two meanings, must be taken in the sense most congruous to the matter of the contract."

The policies are "all-risk," modified "inland marine" policies, Exhibit 1 at p. 17 and attachment "A", p. 1. In the context of marine insurance, Couch discusses the "mechanical breakdown" exclusion:

"[I]t is necessary that the distinction be observed between a clause which excepts the risk of loss arising from, or caused by, derangement or breakage of machinery, and a clause which excepts the risk of any injury, derangement, or breakage of machinery, or any damage resulting from any such events; *under the first clause, the insurer is not exempted from liability for damage to the machinery itself,* while under the latter clause, it is exempted both as to injury occurring directly to the machinery, and losses arising as a result of such injury."

Couch on Insurance 2d (Rev'ed) § 43:188 (emphasis added); *see also id.,* § 43:190. The present clause resembles the first clause in the example. It goes further to make clear that ensuing perils are covered. There is nothing to indicate that such ensuing peril cannot be to the machinery itself, or a result of an excluded peril. *See, Farmers Chemical Association v. Maryland Casualty Co.,* 421 F.2d 319 (6th Cir. 1970) (excluded error in insulation of pipe did not exclude heat damage to the pipe); *Macon Light House Revival Center, Inc. v. Continental Insurance Co.,* 651 F.Supp. 417 (M.D.Ga.1987) (under ensuing peril clause, damage from explosion caused by excluded peril was covered).

Mr. Harmon had been involved in the insurance business from 1938 until his retirement in 1985. He holds various charters and degrees in the insurance field and has devoted several years to the development of all-risk policies for ports in the Pacific Northwest, California, and Gulf Coasts. Exhibit 1, pp. 4–8. He testified[4] in regard to the mechanical and machinery breakdown exclusion in terms of its usage in the insurance industry:

Q What is the purpose of a mechanical breakdown exclusion?

A Well, mechanical and machinery breakdown is designed to eliminate the losses which would normally be considered maintenance and kind of routine, rather than catastrophic.

Q What do you mean by catastrophic losses?

A Well, we're getting a little technical here but it all depends. The word "catastrophic" I think is adjusted to the person involved, a million dollar loss to General Motors might not be catastrophic, but it might be to somebody else. So I use that word—those words advisedly. I guess what I'm trying to say is that a mechanical and machinery breakdown loss is one that you would normally expect to pay yourself and not—is not a risk loss, as an insurance claim should normally be a risk loss.

\* \* \* \* \* \*

Q Is the purpose of the mechanical exclusion to exclude all losses that relate in any way to mechanical breakdown?

A If the mechanical or machinery breakdown exclusion was not amended in any way, then it would be intended to include all loss arising from mechanical breakdown.

Q What do you mean by amended in any way?

A Well, if you—if I could go back to the more simple type claim, the original fire insurance policies, or the generally accepted fire insurance policies

---

4. This testimony was subject to the objection of the defendants who raised it in the event the policy was held to speak for itself. Since construction of the exclusionary clause is necessary, the testimony is relevant under La.Civ. Code Art. 1947 (1870) and admissible under Fed.R.Ev. 701 even if stipulation to the depositions did not result in waiver of contemporaneous objections.

have an electrical apparatus clause which excludes electrical damage. However, they all say that they include loss from ensuing fire. So I think that the mechanical or the electrical apparatus clause in that instance is amended by agreeing that a fire loss arising from that electrical disturbance is covered.

Q  In regard to the policies that we have at issue today, is that the case in these policies?

A  In these policies it is—the machinery and mechanical breakdown clause has been amended to provide coverage for an ensuing peril provided that ensuing peril is an insured peril. It covers damage that is caused by the ensuing peril, not by the original mechanical breakdown. The ensuing peril could be many things. Fire would be one, that would be more easily recognized, but this is an all risk form.

Exhibit 1, pp. 21–24.

The breakage of the worn-out cables was routine and maintenance-related. The purpose of a mechanical or machinery breakdown exclusion in an "all risk" policy is to keep the insurer in its proper role as a bearer of casualties rather than as a warrantor or service contractor of the equipment of the insured.

■ Viewing the policy as a whole, the plain meaning of the words, "loss caused by" at the opening of the "perils excluded" clause is that the costs of replacing the worn out cables and of the loss of use of the bulk loader for a period of time attributable only to the cable repairs are not covered.

■ The consequences of the roll-back of the shuttle were not routine. Rather they were catastrophic to the plaintiff's equipment and operations. The damages to the ship loader were not such as the insured would be expected to bear in the ordinary course of maintenance. The insurer denying coverage under an exclusionary clause must show its applicability to the loss in question. *Taylor v. Security Industrial*

*Insurance Co.,* 454 So.2d 1260, 1263 (La. App. 2d Cir.1984); *see, Borden, Inc. v. Howard Trucking Co., Inc., supra.* The court has given these defendants the benefit of the doubt in view of the history of the policies, and is of the opinion that the parties intended coverage of the type of loss herein, with the narrow exception noted above.

The defendants assert that the decision in *Metal Cutting Specialty Co. v. Maryland Casualty Co.,* 227 So.2d 790 (La.App. 4th Cir.1969) is binding in the present case. In diversity matters this court is bound to follow the decision of an intermediate state court as to a particular issue on which the forum state's supreme court has not ruled, unless "convinced from specific tangible circumstances that the supreme court of the state would hold differently from the lower state court." *Birmingham Fire Insurance Co. of Pennsylvania v. Winegardner & Hammons, Inc.,* 714 F.2d 548, 550 (5th Cir.1983). This assumes, of course, that the issue before the federal court is precisely or essentially the same as that which was decided by the intermediate state court. In *Metal Cutting Specialty Co., supra,* the "ensuing peril" clause extended only to fire or explosion. 227 So.2d 790 at 791. Since the damage to the crane in that case did not result from fire or explosion ensuing from the mechanical breakdown, there was no coverage. If on the other hand *any* ensuing peril had been insured under the exclusion as in the present case, there would have been coverage according to what this court understands the law of Louisiana to be. See the cases interpreting the phrase "due and confined to [the excluded peril]," *e.g., Witherwax v. Zurich Insurance Co.,* 315 So.2d 420 (La.App. 3d Cir.1975); *Bezue v. Hartford Accident and Indemnity Co.,* 224 So. 2d 76 (La.App. 1st Cir.1969).

Accordingly, this court finds that the defendants are liable under their respective policies for the plaintiff's loss with the exception of the replacement of the three cables and the loss of use attributable thereto, and therefore ORDERS that judgment be entered in favor of plaintiff on the

issue of coverage under the policies of insurance as set forth herein.